**INTERSTATE GENERAL GOVERN-
MENT CONTRACTORS, INC.,
Appellant,**

v.

**Togo WEST, Secretary of
the Army, Appellee.**

**No. 92–1430.**

United States Court of Appeals,
Federal Circuit.

Nonprecedential Opinion Issued
June 11, 1993.

Precedential Opinion Issued Dec. 6, 1993.

Glen W. Clark, Jr., Palmer, Howard and Clark, Austell, GA, argued for appellant.

Thomas A. Dinackus, Atty., Commercial Litigation Branch, Dept. of Justice, Washington, DC, argued for appellee. With him on the brief were Stuart M. Gerson, Asst. Atty. Gen., David M. Cohen, Director and James M. Kinsella, Asst. Director. Also on the brief was Major Robert Duecaster, Contract Appeals Div., Army Legal Services Agency, of counsel.

Before MICHEL, RADER, Circuit Judges, and COHN, District Judge.[*]

MICHEL, Circuit Judge.

Interstate General Government Contractors, Inc. (IGGC) appeals from a decision of the Armed Services Board of Contract Appeals (Board) denying IGGC's claim for an equitable adjustment for alleged unabsorbed home office overhead caused by the government's delay in issuing a notice to proceed (NTP) on a contract to renovate army barracks. *Interstate Gen. Gov't Contractors, Inc.*, ASBCA No. 43369, 92–2 BCA ¶ 24,956, 1992 WL 59384 (March 17, 1992). The Board first held that IGGC was not entitled to recover pursuant to the *Eichleay* formula,[1] its sole theory of recovery, because it failed to prove, as required by *Eichleay*, that it was "standing by" awaiting the NTP. Although the Board applied an incorrect legal test concerning standing by, the Board's ultimate decision denying recovery is affirmable on its second holding, that IGGC, which finished early, completely failed to prove that it incurred any costs for home office overhead that were not absorbed by the payments of direct costs during the original performance period.

## BACKGROUND

IGGC entered into contract number DAKF10–89–C–0472 on September 29, 1989 to repair/replace heating, ventilation, and air conditioning piping in Pinwheel Barracks at Hunter Army Airfield, Georgia. The contract specified that "[t]he contractor shall begin performance within 10 calendar days and complete within 472 calendar days after receipt of the notice to proceed." *Interstate Gen.*, 92–2 BCA ¶ 24,956 at 124,364, 1992 WL 59384. The contract also contained a standard protest clause pursuant to 48 C.F.R. § 52.233–3 (1985) providing authority for the contracting officer (CO) to issue a stop-work order if a bid protest were filed, and for an equitable adjustment to the contractor if a stop-work order resulted in increased performance time or cost.

The government conceded that under normal circumstances, the NTP would have issued about October 16, 1989. *Interstate Gen.*, 92–2 BCA ¶ 24,956 at 124,365, 1992 WL 59384. However, IGGC was notified by letter from the CO on October 13, 1989 that due to a bid protest, the NTP would be withheld pending a final decision thereon. *Id.* The Board found that during pendency of the protest IGGC was expected by the CO to "remain ready to commence performance within a 'reasonable time' after the decision was rendered." *Id.*

The bid protest was dismissed on February 16, 1990. The NTP issued on March 1, 1990, with instructions for IGGC to begin performance within ten calendar days and to complete the work within 472 calendar days of issuance of the NTP. IGGC completed performance in 323 calendar days after issuance of the NTP. Therefore, the contract was completed 459 days after October 16, 1989, the date that the NTP would have issued had there been no bid protest. Consequently, completion occurred within the originally-agreed on performance period which would have applied had no delay occurred.

On January 23, 1991, IGGC filed a claim with the CO for $24,749.11 in unabsorbed home office overhead it alleged was caused by the government delay, arguing that the notice of October 13, 1989 constituted a constructive stop-work order under the protest clause. Unabsorbed overhead calculated ac-

---

[*] Honorable Avern Cohn, District Judge for the Eastern District of Michigan, sitting by designation.

1. *Eichleay Corp.*, ASBCA No. 5183, 60–2 BCA ¶ 2688 (1960), *aff'd on recon.*, 61–1 BCA ¶ 2894 (1961), approximates such costs, making them proportional to the ratio of direct costs on the contract to total direct costs times total overhead.

cording to the *Eichleay* formula was claimed, but direct costs were not. IGGC submitted letters from its insurance agent, stating that IGGC had reached its bonding capacity with the performance and payment bonds for the barracks contract, precluding it from bidding on any additional contracts during the pendency of the protest. *Id.* The letters further stated that the bonding company refused to increase IGGC's bonding capacity and would not have looked favorably on it accepting unbonded work. *Id.* IGGC's Vice–President and General Manager, Mr. Christiansen, testified that during the delay, "none of IGGC's workers were idle, that two laborers hired for this job were let go while other workers 'were shuttled on to other jobs,' and that the superintendent, who was standing by ready to start, was 'reassigned other duties on another job.'" *Id.*

The CO issued a final decision denying IGGC's claim on July 29, 1991. IGGC appealed the denial of its unabsorbed overhead claim to the Board.

The Board found that the CO's October 13, 1989 letter was tantamount to a stop-work order and "[a]ccordingly, IGGC [was] entitled to an equitable adjustment for unabsorbed overhead during the protest period upon its carrying its burden of proof that damages were incurred." *Id.* at 124,367, 1992 WL 59384. The Board, however, found that IGGC failed to make a *prima facie* showing that it was on "standby" due to the government delay, noting that "IGGC's work force was gainfully working at other jobs and not standing by awaiting the NTP." *Id.* The Board held that "[t]he record [did] not support IGGC's contention [that] it was incurring unabsorbed overhead during the period of the stop-work order." *Id.*

IGGC appealed to this court pursuant to the Contract Disputes Act of 1978, 41 U.S.C. § 607(g)(1)(A) (1988). Our jurisdiction rests

on that Act and 28 U.S.C. § 1295(a)(10) (1988).

## ANALYSIS

### I.

IGGC argues on appeal that the Board applied an incorrect legal standard regarding standby, and therefore, wrongly held it was not entitled to recovery under *Eichleay*. The Board found that IGGC was not on standby because the work force on the particular contract was reassigned to other work or let go. *Interstate Gen.*, 92–2 BCA ¶ 24,956 at 124,367, 1992 WL 59384. Therefore, there were no contract workers "standing by" during the delay period.

Only after the Board's decision in this case did this court decide *C.B.C. Enterprises, Inc. v. United States*, 978 F.2d 669 (Fed.Cir.1992), clarifying the applicable tests. Thus, although the Board did apply the wrong test, its confusion is understandable. The court generally stated that applying the *Eichleay* formula is appropriate "provided that compensable delay occurred, and that the contractor could not have taken on any other jobs during the contract period." *Id.* at 673–74 (citing *Capital Elec. Co. v. United States*, 729 F.2d 743, 745–46 (Fed.Cir.1984)). *C.B.C.* specifically acknowledged two prerequisites to application of the *Eichleay* formula to recover unabsorbed overhead, assuming government-caused and hence "compensable" delay: (1) that the contractor be on standby[2] and (2) that the contractor be unable to take on other work. Later Federal Circuit cases further clarified this two part test, expressly using the term "standby." *Daly Constr. Inc. v. Garrett*, 5 F.3d 520, 522 (Fed.Cir.1993) (agreeing with the Board's holding that "in order to invoke the *Eichleay* formula [the contractor] had to show that it was required reasonably to *stand by* during the period of delay without staff reduction and that it was

---

**2.** Although not specifically used by us in *C.B.C.* or *Capital Elec.*, the term "stand by" has been used by the Board and the Court of Federal Claims in numerous cases, including *Appeals of Community Heating & Plumbing Co., Inc.*, ASBCA Nos. 37981 *et al.*, 92–2 BCA ¶ 24,870 at 124,072, 1992 WL 42748 *aff'd*, 987 F.2d 1575 (Fed.Cir.1993). *See also C.B.C. Enter. v. U.S.*, 24

Cl.Ct. 187, 191 (1991) (citing, *inter alia, Appeal of Gregory Constructors, Inc.*, ASBCA No. 35960, 88–3 BCA ¶ 20,934, 1988 WL 69213; *Appeal of Ricway, Inc.*, ASBCA No. 29983, 86–2 BCA ¶ 18,841, 1986 WL 19820; *Appeal of VEC, Inc.*, ASBCA No. 35988, 90–3 BCA ¶ 23,204, 1990 WL 133143).

impractical to take on additional jobs during this period.")[3] (emphasis added); *Community Heating & Plumbing Co. v. Kelso*, 987 F.2d 1575, 1582 (Fed.Cir.1993) ("[I]f compensable delay occurs [and, as mentioned elsewhere, the contractor was on "standby"] and the contractor demonstrates that it could not have taken on any other jobs during the contract period, the *Eichleay* formula ... may also be used.").

■ Properly understood, the "standby" test focuses not on the idleness of the contractor's work force (either assigned to the contract or total work force), but on suspension of work on the contract.[4] In *C.B.C.*, in an opinion by Judge Clevenger, the court stated that "[t]he *raison d'etre* of *Eichleay* requires at least some element of uncertainty arising from *suspension, disruption or delay of contract performance.*" *C.B.C.*, 978 F.2d at 675 (emphasis added). More recently, in *Community Heating & Plumbing*, this court held, in an opinion by Judge Bennett, that *Eichleay* was not applicable to a situation involving additional work due to contract modifications as opposed to "*a suspension or hiatus in performance* which would affect direct costs" because "[t]here was no evidence that the contract changes resulted in *a delay in performance* which required [the contractor] to *stand by idly and suspend its work.*" 987 F.2d at 1582 (emphasis added).[5]

■ In this case, the Board focused primarily on the fact that all the workers assigned to this particular contract were reassigned or let go, not on the suspension or delay of work on the contract. Such a focus confuses the issue of direct costs caused by idle workers or equipment at the site—not

claimed here—with the indirect costs of home office overhead recoverable under *Eichleay,*—all that is claimed here. We repeat that application of the *Eichleay* formula does not require that the contractor's work force be idle. *See C.B.C.*, 978 F.2d at 674. It simply requires that overhead be unabsorbed because performance of the contract has been suspended or significantly interrupted and that additional contracts are unavailable during the delay when payment for the suspended contract activity would have supported such overhead.

■ Suspension or delay of contract performance results in interruption or reduction of the contractor's stream of income from direct costs incurred. Home office overhead costs continue to accrue during such periods, however, regardless of direct contract activity. Consequently, this decrease in direct costs necessary to support the continuing overhead creates unabsorbed overhead, unless home office workers are laid off or given additional work during such suspension or delay periods. Even then, fixed overhead costs usually remain.

■ In *C.B.C.*, the court noted that "[the] element of uncertainty, engendered by the fact of disruption, suspension or delay of contract performance, has been present whenever the courts or the Boards of Contract Appeals have permitted extended home office overhead to be calculated under the Eichleay formula." *C.B.C.*, 978 F.2d at 674. When the period of delay or suspension is uncertain, as it was here, and the contractor is required by the government to remain ready to resume performance on short no-

3. In the *Eichleay* context, the reference to "staff reduction" properly refers to reduction of home office staff. *See Eichleay*, 61–1 BCA ¶ 2894 at 15,117 ("[I]t would not have been prudent or practical for appellant either to risk the layoff of *Home Office personnel* or facilities, or, on the other hand, to absorb personnel and facilities so made idle by taking on new commitments.") (emphasis added).

4. Although idleness of workers is evidence that a contractor is on standby, i.e., performance has been suspended, it is neither conclusive nor required. Sound public policy requires this distinction. If the test were whether the contractor's work force assigned to the contract in issue

was standing by, the contractor would be penalized for, and thus deterred from, mitigating its damages for direct costs by reassigning its employees to other jobs or laying them off during the period of delay. Moreover, suspension rarely need be proven by such indirect evidence because it is usually effected, as here, by a written communication from the CO.

5. While the court says "stand by idly," the next phrase states "and suspend its work." Taken together, these two phrases clearly refer to standing by in the sense that no work is being performed on the contract, not that there must be workers physically standing by idly.

tice, the contractor is effectively prohibited from mitigating such overhead costs by making reductions in home office staff or facilities. *See Capital Elec.*, 729 F.2d at 748 (Friedman, J., concurring) ("[I]t is, ordinarily, not practicable to lay off main office employees during a short and indefinite period of·delay.") (*citing Fred R. Comb Co. v. United States*, 103 Ct.Cl. 174, 183–84, 1945 WL 4033 (1945). Assuming that the contractor has not reached his bonding capacity, uncertainty in duration of delays or suspensions can also adversely affect the contractor's ability to absorb the overhead by taking on additional work during the delay periods, because at any given moment the contractor could be required to shift his resources to resume work on the stalled project.

Here, the Board applied an improper legal test by focusing primarily on the fact that there were no idle contract workers during the delay period in concluding that IGGC was not on standby. The proper standby test focuses on the delay or suspension of contract performance for an uncertain duration, during which a contractor is required to remain ready to perform. Standby combined with an inability to take on additional work are the two prerequisites for application of the *Eichleay* formula, because taken together they prevent the contractor from mitigating unabsorbed overhead when it is incurred.

Applying the correct test, the Board's findings could legally support a conclusion that IGGC was on standby. The Board found that during the delay period IGGC was required to remain ready to commence performance within a "reasonable time." *Interstate Gen.*, 92–2 BCA ¶ 24,956 at 124,365, 1992 WL 59384. Furthermore, it is undisputed that the government alone caused the delay and that contract performance was suspended during the delay period. Therefore, payments for direct costs of contract performance activity were also suspended. The Board further found that IGGC's insurance agent indicated in the letter to the contracting officer that IGGC had reached its bonding capacity, precluding it from bidding on any additional bonded contracts during the delay. *Id.* Arguably, these findings could

satisfy both elements required for application of the *Eichleay* formula. For the reasons set forth below, however, it does not provide a ground for reversal in this case.

## II.

Even assuming for the sake of argument that using the correct legal test the Board would have found that IGGC was on standby, however, does not in and of itself entitle IGGC to prevail. IGGC must still prove that despite finishing early it actually incurred compensable unabsorbed overhead costs due to the delay. *Capital Elec.*, 729 F.2d at 746; *C.B.C.*, 978 F.2d at 673. Since the delay was admittedly caused by the government, not the contractor, the overhead costs would be compensable if unabsorbed. Generally, unabsorbed overhead consists of the time sensitive indirect costs incurred despite construction inactivity on a project, such as home office overhead including accounting and payroll services, general insurance, salaries of upper-level management, heat, electricity, taxes, depreciation. *Capital Elec.*, 729 F.2d at 746. Here, of course, only home office overhead is claimed. To prove unabsorbed overhead, the contractor must show that the government-caused delay disrupted the relationship between the contractor's revenue and its overhead costs. *C.B.C.*, 978 F.2d at 671 ("The *Eichleay* formula was devised to calculate reimbursable home office overhead costs in the event of suspension of work on a contract, when the suspension decreases the stream of direct costs against which to assess a percentage rate for reimbursement.").

Where a contractor is able to meet the original contract deadline or, as here, to finish early despite a government-caused delay, the originally bargained for time period for absorbing home office overhead through contract performance payments has not been extended. Therefore, in order to show that any portion of the overhead was unabsorbed, such a contractor must prove that the bargained for ratio of performance revenue to fixed overhead costs during the stipulated performance period, not just the delay period as the Board erroneously stated, has been adversely affected by the delay. This can

only be established if such a contractor shows that from the outset of the contract it: (1) intended to complete the contract early; (2) had the capability to do so; and (3) actually would have completed early, but for the government's actions. Board decisions in *Elrich Contracting, Inc. v. General Services Admin.*, GSBCA No. 10936, 93–1 BCA ¶ 25,-316 at 126,142, 1992 WL 181692 (July 27, 1992) and *Appeal of Frazier–Fleming Co.*, ASBCA No. 34537, 91–1 BCA ¶ 23,378 at 117,287–88, 1990 WL 173258 (Sept. 18, 1990) so held and we today adopt that three part-test.[6]

Unfortunately, the Board did not address those three requirements but merely held that "[t]he record does not support IGGC's contention [that] it was incurring unabsorbed overhead during the period of the [delay] and [therefore] the *Eichleay* formula is not applicable." *Interstate Gen.*, 92–2 BCA ¶ 24,956 at 124,367, 1992 WL 59384.

IGGC argues that the Board's decision must be reversed because the record shows that IGGC did prove unabsorbed overhead. According to IGGC, its completion of the contract 13 days early (as compared to the *original* completion date), despite the 136 day delay in issuance of the NTP, by itself proves that all along it had the intention as well as the capability to do so. IGGC further asserts that it necessarily would have completed the contract six months earlier *but for* the government-caused delay in issuing the NTP, once again apparently based solely on the fact that it did actually complete 13 days early. IGGC cites no other evidence whatsoever to support this last contention, however, relying on attorney argument.

 Even accepting all of IGGC's evidence at face value, it is legally insufficient to meet IGGC's burden of proof. The evidence cannot establish that IGGC had the intent or capability to complete early when it entered into the contract, or that "but for" the government delay IGGC would have completed the contract even earlier than it did. For the reasons stated below, we hold as a matter of law that on this record IGGC cannot prove any of the three requirements noted above.

First, IGGC provided virtually no evidence to establish IGGC's intent to complete early. Indeed, there is no direct evidence whatsoever. The fact that IGGC actually completed the contract 13 days early is not probative that in bidding for the contract IGGC planned to complete performance prior to the 472 day contract performance period. In fact, Mr. Christiansen testified to the contrary. He said that *following* the delay in issuance of the NTP, "[w]e also put additional staff of [sic] personnel on site, *more than what I had anticipated when I first estimated the job,* and using this *new work schedule* we accomplished this job at a much faster rate than the government thought possible."[7] (Emphasis added.) Instead of indicating that when Christiansen "first estimated the job" IGGC intended to complete the contract early, this testimony suggests that IGGC did not intend to complete early, but after the delay invoked significant acceleration methods not contemplated at the time of signing the contract. Moreover, the record contains no contemporaneous evidence, such as internal or external documentation, that even before the government delay IGGC had intended to complete the contract early. Nor does Christiansen assert that he so informed the government. Therefore, there is no legally sufficient evidence to support a finding that IGGC planned from the outset to complete early.

Regarding the second element, IGGC's capability to complete the job as bid early, the record is similarly devoid of evidence. There is no evidence that IGGC formulated a completion schedule at the outset of the contract that would have indicated a capability to complete performance earlier than the full performance period. In fact, the record contains no pre-delay performance schedule whatsoever. The only schedule even men-

---

6. Although *Frazier–Fleming* was decided by the ASBCA 18 months before the Board decided this case, the Board opinion here neither discusses the three part test nor even mentions *Frazier–Fleming*.

7. Potential damages for acceleration costs are not in issue here because IGGC has neither made such a claim, nor quantified any such damages. In any event, the government did not require early completion.

tioned in the record is the accelerated work schedule proposed at the conference *after* the government belatedly issued the NTP. This document thus cannot establish that when it entered into the contract IGGC had a feasible plan to complete performance early.[8] Thus, there is insufficient evidence of capability as a matter of law.

Third, there is legally insufficient evidence to support IGGC's contention that *but for* the government's delay it would in fact have completed performance even earlier. Although Mr. Christiansen testified before the Board that "if it had not been for this delay in notice to proceed we would have finished it six months earlier," such a post-facto, conclusory, self-serving assertion by IGGC's own witness, especially when uncorroborated by and in fact is contradicted by other evidence including his own testimony, is legally insufficient to prove causation. The required nexus between the government delay and a contractor's failure to complete performance at some unspecified earlier date cannot be shown merely by hypothetical, after-the-fact projection. *See Frazier–Fleming*, 91–1 BCA ¶ 23,378 at 117,287, 1990 WL 173258 ("[T]he alleged early completion progress chart that is contained in the evidentiary record herein was submitted to the contracting officer ... long after project completion ..., and represents a hypothetical and after the fact projection only.").

■ We are required to sustain the Board's decision as long as it is not arbitrary, capricious, based upon less than substantial evidence or error of law, or rendered in bad faith. *Fruin–Colnon Corp. v. United States*, 912 F.2d 1426, 1428 (Fed.Cir.1990). Here it is none of the above. Because the evidence was legally insufficient to establish any of the three elements required to show that due to the government delay IGGC, despite completing early, actually incurred unabsorbed overhead costs, the Board could not properly have granted relief.

■ In the normal case, the delay extends performance of the contract beyond the original completion period thereby increasing the period of time for which overhead is incurred (hence it is sometimes called "extended overhead"). That is why in cases such as *Capital Elec.* and *C.B.C.*, unabsorbed overhead is effectively presumed where the contractor can establish standby and the inability to take on additional work. *Capital Elec.*, 729 F.2d at 746; *C.B.C.*, 978 F.2d at 674. We hold today that such a presumption does not apply in cases involving early or on time completion. Rather, in such cases, unabsorption must be proven via the three-part test.

Here, the overhead was not "unabsorbed" because it was supported by the bargained-for contract activity during the agreed 472 day performance period. That is, the direct costs and related home office overhead associated with the contract were all incurred within the original performance period in the contract. Therefore, under the fixed percentage formula incorporated in the contract for overhead, all overhead was absorbed. Only if the delay extended the performance period or otherwise increased the ratio of overhead to direct costs could they be unabsorbed. *C.B.C.*, 978 F.2d at 674. But here, neither of those scenarios occurred.[9] Therefore, as a matter of law IGGC cannot recover.

## CONCLUSION

We affirm the Board's conclusion that IGGC is not entitled to an equitable adjustment pursuant to the *Eichleay* formula because IGGC's evidence was legally insufficient to meet its burden of proving that it incurred any unabsorbed overhead due to the government's delay. In this early completion case, unabsorption must be proven via the three-part test, but IGGC's proof was legally insufficient as to all three elements. The

---

8. A "feasible plan" is required by the Board decision in *Frazier–Fleming*, 91–1 BCA ¶ 23,378 at 117,287, 1990 WL 173258. We see no error in such a requirement.

9. For the same reasons, its proven inability to take on additional work because of reaching its bonding capacity and its standby status do not support recovery.

Board's decision denying reimbursement is therefore

*AFFIRMED.*