**PETE VICARI, GENERAL CONTRACTOR, INC.,**
Plaintiff,

v.

**The UNITED STATES, Defendant.**

No. 99–988C.

United States Court of Federal Claims.

Aug. 26, 2002.

Stephen J. Caire, Metairie, LA, for plaintiff.

Lauren S. Moore, Washington, DC, with whom was Assistant Attorney General Robert D. McCallum, Jr., for defendant, Keith Moore–Erickson, U.S. Coast Guard, of counsel.

## OPINION

MILLER, Judge.

Having changed attorneys, this is defendant's second effort to dispatch this case on summary judgment. *See Pete Vicari, Gen. Contractor, Inc. v. United States,* 47 Fed.Cl. 353 (2000). After the court granted summary judgment on three of the five counts in plaintiff's original complaint brought under the Contract Disputes Act of 1978, 41 U.S.C. §§ 601–613 (2000), plaintiff filed an amended complaint adding additional claims for delays, extended indirect costs, certain direct costs, and the return of liquidated damages withheld by the Government. At issue is whether plaintiff is entitled to (1) an extension of the contract for alleged delays caused by the Government; (2) recovery of its extended indirect costs caused by the delays and other modifications to the contract; (3) compensation for work that the Government claims to have performed itself; and (4) return of liquidated damages withheld by the Government. Argument is deemed unnecessary.

## FACTS

The facts recited with respect to each claim are undisputed, unless otherwise noted. On March 13, 1997, Pete Vicari, General Contractor, Inc. ("plaintiff"), and the United States Coast Guard (the "USCG") entered into Contract No. DTCG47–97–C–3EFK 01 (the "contract") for road resurfacing and the construction of New Family Housing, Unaccompanied Personnel Housing ("UPH"), and a fire lane at the USCG station at Grand Isle, Louisiana. The contract was a firm fixed-price contract. Under the contract the USCG agreed to pay plaintiff $3,850,335.00

for the work, which plaintiff agreed to finish by April 8, 1998. A Notice To Proceed was issued on April 9, 1997.

### 1. *Glued-laminated beam submittals*

The contract specifications required plaintiff to submit shop drawings for "glued-laminated" beams to be used in the project.[1] The specifications defined the drawings as

[d]esign analysis and calculations of structural laminated members, showing design criteria used to accomplish the applicable analysis. Drawings of structural laminated members indicating materials, shop fabrication, and field erection details; including methods of fastening.

The specifications charged that the USCG generally would review and return routine submittals within two weeks.

On September 9, 1997, plaintiff submitted preliminary drawings for the glued-laminated beams, Submittal No. 41, to Graves and Carlos Architects, P.C. ("G & C"), the USCG's architect/engineer for the project. The drawings were created by plaintiff's supplier, Structural Woods Systems ("Structural Woods"), which plaintiff hired to fabricate the glued-laminated beams. G & C received Submittal No. 41 two days later, on September 11, 1997.

G & C returned Submittal No. 41 to plaintiff on October 3, 1997, stamped "Rejected–Revise and Resubmit." The stated basis for the rejection was that Submittal No. 41 was incomplete. Submittal No. 41 was marked "FOR INFORMATION ONLY; NOT FOR FABRICATION." Failing to bear the seal or stamp of a professional engineer, Submittal No. 41 instead was marked "FINAL ENGINEERING NOT COMPLETE AT THIS TIME. LOUISIANA [Professional Engineer] SEAL WILL BE ON 'FINAL' PRINTS."

Plaintiff resubmitted the glued-laminated beam drawings to G & C on October 16, 1997, as Submittal No. 54. As with Submittal No. 41, Submittal No. 54 contained the legend "FOR INFORMATION ONLY; NOT FOR FABRICATION," and "FINAL ENGINEERING NOT COMPLETE AT THIS TIME. LOUISIANA [Professional Engineer] SEAL WILL BE ON 'FINAL' PRINTS." G & C reviewed and approved Submittal No. 54 and returned it on October 23, 1997, to plaintiff with corrections as noted.

On October 24, 1997, Structural Woods verbally contacted G & C to seek additional information about the approved submittal. On November 10, 1997, Structural Woods requested a deviation to one of the connections on the submittal. Plaintiff had no knowledge of these communications between Structural Woods and G & C until sometime after November 10, when Structural Woods notified plaintiff that it had requested information from G & C. On December 3, 1997, plaintiff submitted a formal request to G & C seeking the same information requested by Structural Woods. G & C responded to plaintiff's request on December 11, 1997.

On May 11, 1998, plaintiff requested additional compensation and an equitable adjustment for 82 days of delay, which represents the time period from September 21, 1997, the date on which plaintiff alleges that G & C should have approved Submittal No. 41, to December 11, 1997, when fabrication of the glued-laminated beams actually began.[2] In addition to the Government's failure to approve Submittal No. 41, plaintiff's letter charged that "there were numerous questions left unanswered" in G & C's October 23, 1997 approval that contributed to the delay. Plaintiff also maintained that G & C's and Structural Woods' corresponding without plaintiff's knowledge also delayed the start of fabrication.

On August 11, 1998, the contracting officer unilaterally issued Modification No. 0007 extending the contract completion date by 17 days to compensate plaintiff for G & C's late

---

1. Although the contract refers to "glued-laminated members," the parties refer interchangeably to "glu-laminate," "glue-laminated," and "glulam" beams. The court takes judicial notice that the terms refer to a method of laminating wood in order to make it better suited for construction.

2. Plaintiff asserted that the contract specifications required that G & C return submittals to plaintiff within ten days. As discussed above, the specifications provided that the USCG would review and return routine submittals within two weeks.

return of Submittal No. 41. On September 11, 1998, plaintiff submitted a claim to the contracting officer demanding the full 82–day extension and compensation in the amount of $116,729.01 for the delay. The contracting officer denied this claim on December 11, 1998.

### 2. *UPH design deficiencies*

During the course of performance, plaintiff claimed reimbursement from the USCG for delays and additional work resulting from alleged deficiencies in structural framing designs issued by G & C with respect to the UPH barracks (the "UPH design deficiencies"). *See generally Pete Vicari*, 47 Fed.Cl. at 356. Plaintiff requested modifications to the contract to increase the contract price for the cost of these delays and additional work. The USCG, plaintiff, and G & C negotiated and executed an Agreement of Compromise, Settlement and Release (the "Settlement Agreement"), dated January 5, 1999, limited to "structural modifications and associated work on the UPH Barracks." The Settlement Agreement compensated plaintiff in the amount of $111,410.74 and granted an extension of time, from January 18, 1999, to March 31, 1999, to complete the project. The Settlement Agreement recited that it was in full satisfaction of plaintiff's claims against G & C and the USCG for both delays and design deficiencies. In consideration for plaintiff's release of its claims regarding the design deficiencies, the USCG gave up its right to assess liquidated damages for delay in completion of the project.

### 3. *Drywall installation*

By letter dated June 14, 1999, plaintiff requested an extension of 36 days due to a shortage of drywall. In a prior letter dated May 11, 1999, plaintiff had explained that, absent the UPH design deficiencies, it could have ordered the drywall earlier, thereby presumably avoiding the shortage. On April 3, 2000, the USCG unilaterally issued Modification No. 0016 to the contract, effective June 22, 1999, extending the contract completion date 19 days due to the shortage. Plaintiff's August 18, 2000 claim to the contracting officer sought the 17 days not allowed by Modification No. 0016, arguing that "[i]f the UPH Barracks would not have been delayed due to design problems caused by [G & C] we could have ordered the material as originally scheduled and would not have been delayed." The contracting officer rejected plaintiff's claim on the ground that plaintiff had not justified an extension beyond 19 days.

### 4. *Additional carpentry*

Plaintiff's August 18, 2000 claim to the contracting officer also explained: "Due to many interruptions and delays in framing of the UPH Barracks, we experienced a higher than normal labor cost. We were not able to maintain a crew of sufficient size and we were forced to do this work during the summer months in lieu of the winter as planned." Plaintiff's amended complaint requested an equitable adjustment for "additional carpentry labor." Am.Compl. filed May 25, 2001, at ¶ 73. Plaintiff concedes, however, that it was not required to perform more carpentry work than it anticipated when it submitted its bid. Pl.'s Response to Def.'s Proposed Finding of Fact No. 46. Instead, plaintiff's claim appears to seek a 45–day extension and compensation for delayed carpentry work.

### 5. *Other modifications*

As discussed above, Modification No. 0016 added 19 days to the contract to account for the drywall shortage. Modification Nos. 0014, 0015, 0020, and 0025 further added a total of 89 days to the contract to account for various changes. The parties agree that Modification Nos. 0014 and 0015 increased the contract price by amounts that included amounts for home office overhead and field office overhead. For example, Modification No. 0015, issued in response to an April 1, 1999 change-order proposal submitted by plaintiff, increased the contract price by the entire $898.00 requested by plaintiff. Plaintiff's change-order proposal arrived at the $898.00 figure after calculating Field Overhead at 7% of the cost of the changed work and Home Office Overhead at 3%. Modification No. 0014 stated that the price increase was compensation for "direct labor, material, and equipment costs of the changed work but

does not include any allowance for resultant impacts, delays, or disruptions for changed or unchanged work, claim for which is specifically reserved."

### 6. *Punchlist items*

On December 30, 1999, the contracting officer sent to plaintiff by facsimile transmission a "Construction Discrepancy List"—or "punchlist"—enumerating items that, in the contracting officer's judgment, must be repaired or replaced by February 24, 2000. By letter dated January 5, 2000, the contracting officer advised plaintiff that the UPH Barracks were accepted effective December 21, 1999. That letter also advised plaintiff that any punchlist items not completed by February 24, 2000 would be performed by the Government at plaintiff's expense. On June 8, 2000, the contracting officer unilaterally issued Modification No. 0028 decreasing the contract price by $24,479.42. Modification No. 0028 claimed that plaintiff's failure to correct punchlist items had forced the Government to correct those deficiencies itself.

### 7. *Liquidated damages*

The contracting officer, in a letter dated May 7, 1999, advised that liquidated damages would be assessed against plaintiff for each day that work was not complete beyond the contract completion date, as extended. The contracting officer deducted liquidated damages from the contract price in the amount of $437.00 per day beginning on August 13, 1999, and continuing through December 21, 1999, for a total of $56,810.00 for 130 days. Plaintiff was advised that liquidated damages were being imposed by letter dated June 8, 2000.

### 8. *Plaintiff's claims*

Count II of plaintiff's original complaint seeks the relief denied in the contracting officer's December 11, 1998 final decision regarding the alleged delay in fabrication of the glued-laminated beams. Specifically, plaintiff requests $116,729.01, calculated, as follows:

| | | |
|---|---|---|
| 82 days × $378.56 (G & A Cost) | = | $ 31,041.92 |
| 82 days × $879.86 (Job Cost) | = | $ 72,148.52 |
| Subtotal | = | $103,190.44 |
| Prime's Office Overhead 3% | = | $ 3,095.71 |
| Prime's Profit 9% | = | $ 9,287.13 |
| Bond Premium 1% | = | $ 1,155.73 |
| Total | = | $116,729.01 |

Compl. filed Dec. 10, 1999, ¶ 47. Count V of the amended complaint similarly demands "Extended General & Administrative Cost of $413.84 per day and Extended Job Overhead Cost of $879.86 per day" for the 108 days that the contract was extended unilaterally by Modification Nos. 0014, 0015, 0016, 0020, and 0025. Am.Compl. ¶¶ 64, 66.

By Count VI of the amended complaint, plaintiff claims the 17 days not granted by the contracting officer in Modification No. 0016 for delay in drywall installation, plus $21,992.90 for "Extended General & Administrative Cost of $413.84 per day and Extended Job Overhead Cost of $879.86 per day during each of the 17 days." Am.Compl. ¶ 71.

With regard to additional carpentry delays, Count VII of the amended complaint pleads relief in three forms: (1) an equitable adjustment extending the contract completion date by 45 days; (2) $81,645.42 in additional costs; and (3) $58,216.50 for "Extended General & Administrative Cost of $413.84 per day and Extended Job Overhead Cost of $879.86 per day during each of the 45 days." *Id.* ¶ 74.

Amended complaint Count VIII seeks to recoup the entire $24,479.42 that the contracting officer deducted from the contract price on the ground that plaintiff timely completed the punchlist work itself. Finally, Count IX demands the entire $56,810.00 withheld by the contracting officer as liquidated damages.

### DISCUSSION

#### 1. *Summary judgment*

Summary judgment is proper when no genuine issues of material fact are in dispute and the moving party is entitled to judgment as a matter of law. RCFC 56(c). Genuine disputes of material facts that may significantly affect the outcome of the matter preclude an entry of judgment. *Anderson v.*

*Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A genuine dispute concerning a material fact exists when the evidence presented would permit a reasonable jury to find in favor of the non-movant. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. Moreover, the summary judgment "standard mirrors the standard for a directed verdict ... which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict." *Id.* at 250, 106 S.Ct. 2505.

The moving party bears the burden of demonstrating the absence of genuine issues of material facts. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Any evidence presented by the opponent is to be believed, and all justifiable inferences are to be drawn in its favor. *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505. However, although entitled to "all applicable presumptions, inferences, and intendments," *H.F. Allen Orchards v. United States,* 749 F.2d 1571, 1574 (Fed.Cir.1984), the non-movant bears the burden of presenting sufficient evidence upon which the trier of fact reasonably could find in its favor. *Anderson,* 477 U.S. at 250, 106 S.Ct. 2505. To create a genuine issue of fact, the non-movant must do more than present some evidence on an issue it asserts is disputed: "[T]here is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. If the evidence [of the non-movant] is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505 (citations omitted). Accordingly, unsupported assertions or conclusory allegations are insufficient to withstand summary judgment. *SRI Int'l v. Matsushita Elec. Corp.,* 775 F.2d 1107, 1116 (Fed.Cir.1985).

### 2. *Plaintiff's delay claims*

#### 1) *Glued-laminated beam submittals*

■ Plaintiff has alleged that G & C's conduct in approving the glued-laminated shop drawings delayed fabrication of the

glued-laminated beams a total of 82 days. According to plaintiff, this delay was the result of (1) G & C's failure to timely approve Submittal No. 41; (2) deficiencies in G & C's approval of Submittal No. 54; and (3) G & C's communication with Structural Woods without plaintiff's knowledge. Defendant's motion argues that G & C properly rejected Submittal No. 41.[3]

Plaintiff counters that G & C approved Submittal No. 54 because the drawings were complete. Consequently, because Submittal No. 54 was identical to Submittal No. 41, plaintiff views G & C's approval of Submittal No. 54 as conclusively establishing that G & C should have approved Submittal No. 41.

According to defendant, both Submittal Nos. 41 and 54 were incomplete, and G & C could have rejected both. Defendant proposed as a finding of fact that G & C approved Submittal No. 54 in response to plaintiff's request that G & C review the submittal in the interest of moving the project along. Plaintiff disputed this finding, pointing out that, in a May 28, 1998 letter explaining its approval to the contracting officer, G & C stated: "We found the documents to be generally complete and *approved them* with corrections as noted, so that fabrication could begin." A genuine dispute therefore exists as to the basis for G & C's eventual approval of the shop drawings.

The parties' dispute concerns the degree of finality called for under the contract specifications. 48 C.F.R. (FAR) § 52.236–21(e) (2001), requires that

> the Contractor shall coordinate all such drawings, and review them for accuracy, completeness, and compliance with contract requirements and shall indicate its approval thereon as evidence of such coordination and review. Shop drawings submitted to the Contracting Officer without evidence of the Contractor's approval may be returned for resubmission.

Defendant argues that Submittal No. 41 was incomplete on its face due to the stamp "FI-

---

**3.** Defendant makes no argument regarding the alleged problems with G & C's October 23, 1997 approval or the subsequent communications between G & C and Structural Woods.

NAL ENGINEERING NOT COMPLETE AT THIS TIME."[4]

Plaintiff views the purpose of submitting shop drawings as obtaining comments and corrections from G & C: "It is, by nature, a procedure designed to solicit a response from the architect after which the plans are drawn for the fabrication process." Compl. ¶ 37. According to plaintiff, defendant's standard of completeness would defeat the purpose of the submittals. Instead, the indication that the drawings were "NOT FOR FABRICATION" merely reflected the fact that fabrication would not commence until G & C's responses had been incorporated into the drawings. Likewise, the indication that final engineering was not complete and that a Louisiana professional engineer's seal would appear on the final print indicated only that, once G & C's responses were incorporated into a final drawing from which fabrication would take place, the drawing would contain an engineer's seal.

Plaintiff submits that, once it explained its notations to G & C, the architect/engineer agreed to approve the drawings. Consistent with its May 11, 1998 and September 11, 1998 letters to the contracting officer, "[a]fter the supplier explained to the Architect that they would receive stamped drawings after all changes were agreed to by both firms, the Architect agreed to review the original submittal." Compl. ¶ 36.

Plaintiff's argument is persuasive as a matter of common sense, and defendant offers no reason to construe the FAR standard of completeness to prohibit the advisory warnings contained on the shop drawings. Plaintiff also offers the affidavit of Ralph W. Junius, Jr., a licensed Louisiana professional engineer, attesting that it is standard industry practice to submit shop drawings with the advisory warnings contained on both Submittal Nos. 41 and 54. Accepting the truthfulness of his statements, it remains disputed whether G & C properly rejected Submittal No. 41 as incomplete.

Defendant therefore is not entitled to summary judgment on plaintiff's claim that the Government delayed fabrication of the glued-laminated beams a total of 82 days. Further proceedings are required to determine whether Submittal No. 41 conformed to industry practice and whether G & C should have been aware of that practice. Moreover, irrespective of any industry practice, it remains disputed whether G & C's rejection of Submittal No. 41 was proper. Relevant to these issues is the dispute whether G & C ultimately approved Submittal No. 54 in acquiescence to plaintiff's request to expedite the review process, or because Submittal No. 54—and necessarily Submittal No. 41—was "generally complete" when submitted.

2) *Drywall installation and the UPH design deficiencies*

■ Defendant argues the Settlement Agreement bars plaintiff's claim for drywall installation. The court already has determined that the Settlement Agreement constitutes a an enforceable accord and satisfaction with regard to any UPH design deficiencies. *Pete Vicari,* 47 Fed.Cl. at 360–61. Plaintiff does not challenge the validity of the Settlement Agreement—only its scope.

Contract interpretation is a question of law and therefore is particularly amenable to resolution on summary judgment. *Dalton v. Cessna Aircraft Co.,* 98 F.3d 1298, 1305 (Fed. Cir.1996); *Gov't Sys. Advisors, Inc. v. United States,* 847 F.2d 811, 812 n. 1 (Fed.Cir. 1988). General rules of contract interpretation apply to contracts to which the Government is a party. *Lockheed Martin IR Imaging Sys., Inc. v. West,* 108 F.3d 319, 322 (Fed.Cir.1997). The court's examination be-

---

4. Defendant argues that Submittal No. 41 did not include the "design analysis and calculations of structural laminated members" or show the "design criteria used to accomplish the applicable analysis," as required by the contract specifications. Def.'s Proposed Finding of Fact No. 6. In addition to the specifications, defendant contends that Submittal No. 41 failed to satisfy FAR § 52.236–21(d), which defines "shop drawings" as drawings "showing in detail (1) the proposed fabrication and assembly of structural elements and (2) the installation (i.e., form, fit, and attachment details) of materials or equipment." Plaintiff responds that the design criteria used to accomplish the applicable analysis were contained in notations on the shop drawings. Defendant did not reply on this point, and, as the notations do contain technical data, the court can find only that this disagreement constitutes a genuine dispute of material fact.

gins with the plain language used by the parties in contracting. *Textron Defense Sys. v. Widnall,* 143 F.3d 1465, 1468 (Fed.Cir. 1998); *Aleman Food Servs., Inc. v. United States,* 994 F.2d 819, 822 (Fed.Cir.1993). When the contract language is unambiguous, the court's inquiry is at an end, and the plain language of the contract is controlling. *Textron Defense,* 143 F.3d at 1469. A contract term is unambiguous when there is only one reasonable interpretation. *A–Transport N.W. Co. v. United States,* 36 F.3d 1576, 1584 (Fed.Cir.1994).

The Settlement Agreement states, in pertinent part:

> Vicari, for and in consideration of [$114,-410.74] hereby compromises, settles and releases all claims, demands and causes of action which it has or may have against the Coast Guard and G + C ... which arise out of or relate to, past, present or future, the above-defined "structural modifications and associated work on the UPH Barracks."

The Settlement Agreement defined "structural modifications and associated work on the UPH Barracks" to include "without limitation, the removal of light weight wood joists and the addition of steel beams ..., the addition of a wood header at the stair ..., and changes to the paving under the UPH Barracks." Following execution of the Settlement Agreement, plaintiff and the USCG executed Modification No. 0012 to the contract, expressly referencing the Settlement Agreement.

Defendant argues that, to the extent that plaintiff's claim is predicated on work related to modifications issued to cure UPH design deficiencies, the Settlement Agreement bars it. The court agrees. Plaintiff attempts to elude this result by arguing that "The Agreement strictly defines the 'structural framing modifications and associated work on the UPH Barracks' as that which is set forth in Vicari's letter of December 22, 1998 to the Coast Guard." Pl.'s Br. filed May 31, 2002, at 15. Because the December 22 letter did not mention the installation of drywall, plaintiff argues that such work falls outside of the scope of the Settlement Agreement.

Plaintiff misreads the Settlement Agreement, which actually states:

> Vicari's claims for additional time and money for the "structural framing modifications and associated work on the UPH Barracks" are set forth in its letter of December 22, 1998 to the Coast Guard and include, without limitation, the cost, price of the work, labor, materials, subcontracts, job costs, job overhead and profit, as well as claims for equitable adjustment to Vicari's contract sum and contract time.

This passage does not define "structural framing modifications and associated work"; rather, it defines the claims for the modifications and associated work that plaintiff had put forward to date. The Settlement Agreement, however, is not limited to the claims set forth in the December 22 letter. Plaintiff therein released the Government from "all claims, demands and causes of action which it has or may have ... which arise out of or relate to, past, present or future, the above-defined 'structural modifications and associated work on the UPH Barracks.'" By referencing the December 22 letter, the Settlement Agreement enshrined the release of all the claims in that letter. The full scope of the release, however, extends beyond those claims previously made by plaintiff and encompasses any and all claims it could make in the future in relation to the additional work caused by the UPH design deficiencies.

To the extent that plaintiff's claim is predicated on work related to modifications issued to cure UPH design deficiencies, it is barred by the Settlement Agreement. To the extent that the delay in drywall installation is not associated with the UPH design deficiencies, it is not barred by the Settlement Agreement. The Settlement Agreement did reserve plaintiff's right to compensation for "additional time and/or money for matters other than the above-defined 'structural modifications and associated work on the UPH Barracks.'"

The documentary record of plaintiff's drywall installation claim would tend to support a finding that it is barred by the Settlement Agreement. Plaintiff's May 11, 1999 letter to the contracting officer explained that, absent the UPH design deficiencies, it could have

ordered the drywall earlier, presumably avoiding the shortage. Similarly, plaintiff's August 18, 2000 claim to the contracting officer offered one argument that the full 36–day extension should have been granted: "If the UPH Barracks would not have been delayed due to design problems caused by [G & C] we could have ordered the material as originally scheduled and would not have been delayed."

Plaintiff argues that references to UPH design deficiencies in its May 11, 1999 letter were not intended as an explanation for plaintiff's inability timely to install drywall. Plaintiff offers the general proposition that "the Government was responsible for the plaintiff's inability to order the drywall material and have it on site before mid February, 1999." Pl.'s Br. filed May 31, 2002, at 15. This assertion, standing alone, is insufficient to withstand a motion for summary judgment. *SRI Int'l*, 775 F.2d at 1116 (non-movant must demonstrate evidentiary conflict by more than conclusory statements or mere denials).[5]

Plaintiff attempts to bolster this statement with two charts. Exhibit 1, entitled "Comparison Chart: Actual Start—Actual Finish; Scheduled Start—Scheduled Finish," is a transparency chronology charting both as-planned and as-built start and finish dates. It indicates that plaintiff expected to begin installing drywall on November 26, 1997, but that drywall was not ordered until April 29, 1999, and shows that installation did not commence until May 31, 1999. Although Exhibit 1 portrays that drywall installation was delayed, it reveals no facts relating to the cause of that delay. Exhibit 2, another transparency entitled "Chart of USCG Demands on Work Force for Punch List on Family Housing Demonstrating Conflicts with Demands for Labor on UPH Barracks," reflects only that plaintiff submitted a letter concerning drywall delays on June 14, 1999, and that Modification No. 0016 was effective on June

22, 1999. In short, neither exhibit is evidence that, other than the UPH design deficiencies, "the Government was responsible for the plaintiff's inability to order the drywall material and have it on site before mid February, 1999." Pl.'s Br. filed May 31, 2002, at 15.

Plaintiff also fails to offer evidence attributing any delay to the late delivery of glued-laminated beams. According to the affidavit of Huey P. Breaux, an employee of plaintiff with experience in estimating, scheduling, and project management, the delay in delivery and erection of the glued-laminated beams caused a "domino effect" that prevented work from resuming on the UPH Barracks until April of 1998. Affidavit of Huey P. Breaux, May 27, 2002, ¶ 2. This statement, assuming its veracity, does not justify an inference that the USCG prevented plaintiff from ordering drywall before 1999.

Plaintiff's amended complaint nevertheless can be construed to justify the full 36–day extension as excusable delay due to the drywall shortage. Indeed, despite plaintiff's references to the UPH designs and government-caused delay, this is the only rational characterization of plaintiff's claim. The extension originally requested by plaintiff was based on the fact that plaintiff anticipated a one-week turnaround on its April 29, 1999 drywall order. Due to the shortage, plaintiff did not receive the entire drywall order until June 14, 1999. Consequently, plaintiff submitted a request on June 14, 1999, for an extension to account for the difference between the date on which it anticipated receiving the drywall and the date on which it actually received the drywall: "But due to the manufacturer production delays [*i.e.*, the drywall shortage] we were delayed thirty-six (36) days (May 10, 1999 through June 14, 1999) in receiving our drywall material for the UPH Barracks." So construed, plaintiff's request for the entire 36–day extension is not affected by plaintiff's failure to estab-

---

5. The same holds true for plaintiff's counsel's unsupported assertion that

[m]odification 0016 was a retroactive Unilateral Modification issued by the Contracting Officer on 4–3–00 as arbitrary, capricious and punitive measures against the Plaintiff because the Contracting Officer walked out of the meet-

ing of 2–28–00, when plaintiff refused to be pressured into signing Modifications which did not accurately and fairly fulfill and discharge the Government's obligations and duties to the Contractor.

Pl.'s Br. filed May 31, 2002, at 15–16.

lish that the Government prevented plaintiff from obtaining drywall before February 1999. *See* Pl's Br. filed May 31, 2002, at 15.

■ Defendant's motion for summary judgment is denied to the extent that plaintiff challenges the contracting officer's decision not to grant the entire 36–day extension originally requested by plaintiff based on excusable delay. However, to the extent that plaintiff's claim is predicated on the UPH design deficiencies or government-caused delay that prevented plaintiff from obtaining drywall before a particular date, defendant is entitled to judgment as a matter of law.

### 3) *Additional carpentry*

■ Plaintiff's claim for delayed carpentry work, like its drywall claim, appears to arise out of the UPH design deficiencies.[6] Defendant therefore argues that this claim also is barred by the Settlement Agreement.

Plaintiff's August 18, 2000 claim explained: "Due to many interruptions and delays in framing of the UPH Barracks, we experienced a higher than normal labor cost. We were not able to maintain a crew of sufficient size and we were forced to do this work during the summer months in lieu of the winter as planned." To the extent that plaintiff's claim for additional carpentry is predicated on delays caused by the UPH design deficiencies, the Settlement Agreement bars it.

As with plaintiff's claim for drywall installation delays, plaintiff argues that its August 18 characterization of its additional carpentry claim was not intended to be an analysis or explanation of the cause of the delays to the progress of the work. Plaintiff again asserts that the charts it has prepared show that "the Government is responsible for the Plaintiff's inability to maintain a crew of sufficient size." Pl.'s Br. filed May 31, 2002, at 16. Plaintiff further points out that its August 18 claim also explained that the costs were "[d]ue to many interruptions." *Id.* at 17.

Plaintiff offers no explanation of what those interruptions are. Again, the charts generally show when plaintiff expected to start and finish certain tasks and when plaintiff actually started and finished certain tasks. With one exception those charts do not suggest why certain tasks were commenced later than expected. That exception is a series of notations on the as-planned/as-built Exhibit 1 related to the discovery of the UPH design errors and plaintiff's remedial efforts. However, under the Settlement Agreement, plaintiff is barred from asserting claims that arise out of or relate to the UPH design deficiencies.

■ Mr. Breaux states generally that both the delay in fabrication and erection of the glued-laminated beams and the delays caused by the UPH design deficiencies coincided with an industry-wide labor shortage. According to Mr. Breaux, by the date plaintiff was able to begin carpentry work, it could not maintain a labor force sufficient to complete the carpentry work as planned. Because the extent to which the Government caused a delay in failing to approve Submittal No. 41 remains a genuine issue of fact, whether plaintiff is entitled to additional time for carpentry work also remains in dispute. Summary judgment is therefore inappropriate with regard to plaintiff's claims for an extension of the contract completion date and for additional direct costs for delayed carpentry work.

### 3. *Plaintiff's claims for extended indirect costs*

■ The large part of plaintiff's monetary claims represent extended general and administrative costs and extended job overhead costs during the alleged delays and during the periods that the contract was extended in various unilateral modifications. "Unabsorbed" or "extended" indirect costs refer to indirect costs incurred during a period where the Government has reduced the amount of

---

6. Plaintiff's amended complaint requested an equitable adjustment for "additional carpentry labor." Am.Compl. ¶ 73. Plaintiff concedes, however, that it was not required to perform more carpentry work than it anticipated when it submitted its bid, but that it paid higher rates for

carpentry labor that it originally expected. Instead, plaintiff's claim appears to be for a time extension and damages reflecting extended home office overhead to account for delayed carpentry work, as well as the higher labor costs it incurred as a result of the delays.

work that the contractor can perform. As a result, a contractor continues to incur indirect costs (*e.g.,* overhead), but has a lesser or no direct cost basis over which to allocate those indirect costs. The indirect costs are said to be "unabsorbed" by the contract, and a contractor is entitled to recover these costs based on the so-called "*Eichleay*" calculation. *E.g., Charles G. Williams Constr., Inc. v. White,* 271 F.3d 1055, 1057–58 (Fed.Cir. 2001); *Interstate Gen. Gov't Contractors, Inc. v. West,* 12 F.3d 1053, 1057 (Fed.Cir. 1993). *See generally Eichleay Corp.,* ASBCA No. 5183, 60–2 B.C.A. (CCH) ¶ 2688, 1960 WL 538 (1960).

In order to recover under *Eichleay,* a contractor must establish that (1) a government-caused delay occurred; (2) the delay required that the contractor "stand by" during the delay; and (3) it was impractical for the contractor to obtain replacement work while on standby. *Satellite Elec. Co. v. Dalton,* 105 F.3d 1418, 1421 (Fed.Cir.1997); *West v. All State Boiler, Inc.,* 146 F.3d 1368, 1377 (Fed.Cir.1998). The contractor makes a *prima facie* case for recovery by establishing that the Government required it to remain on standby. *Melka Marine Inc. v. United States,* 187 F.3d 1370, 1375 (Fed.Cir.1999). The burden of production then shifts to defendant to rebut this *prima facie* case with evidence either that it was not impractical for the contractor to take on other work while on standby, or that the delay did not cause the contractor's inability to take on other work. *All State Boiler,* 146 F.3d at 1376. The Government's burden is one of production only; plaintiff bears the ultimate burden of persuasion that it was impractical for it to obtain sufficient replacement work. *Melka Marine,* 187 F.3d at 1376.

As discussed above, a genuine dispute exists as to whether the Government caused certain delays. Nevertheless, defendant also moves for summary judgment on whether plaintiff was on standby and whether it was impractical for plaintiff to obtain additional work while on standby.

A contractor is on "standby" when work on a project is suspended for a period of uncertain duration and the contractor can at any time be required to return to work immediately. *All State Boiler,* 146 F.3d at 1373. The standby test does not focus on the idleness of the contractor's work force, nor does the standby test require that the contract be suspended before a contractor is entitled to recover under *Eichleay. Altmayer v. Johnson,* 79 F.3d 1129, 1134 (Fed.Cir.1996); *Interstate Gen.,* 12 F.3d at 1057. "The proper standby test focuses on the delay or suspension of contract performance for an uncertain duration, during which a contractor is required to remain ready to perform." *Interstate Gen.,* 12 F.3d at 1058. "When the period of delay or suspension is uncertain . . . and the contractor is required by the government to remain ready to resume performance on short notice, the contractor is effectively prohibited from mitigating such overhead costs by making reductions in home office staff or facilities." *Id.* at 1057–58.

Plaintiff has offered no facts tending to show that any of the delays for which it seeks extended indirect costs required plaintiff to remain ready to resume work on short notice such that it was "effectively prohibited from making reductions in home office staff or facilities or [from] taking on additional work." *Wickham Contracting Co. v. Fischer,* 12 F.3d 1574, 1577–78 (Fed.Cir.1994). Nor does plaintiff make a showing that it suffered "an interruption or reduction of the contractor's stream of payments for direct costs incurred." *Id.* at 1577. Rather, the record developed on summary judgment supports only a finding that work on the contract "continue[d] uninterrupted, albeit in a different order than originally planned." *Melka Marine,* 187 F.3d at 1375–76.

Plaintiff's claim to recover under the *Eichleay* formula for 89 days unilaterally added to the contract through Modification Nos. 0014, 0015, 0020, and 0025 is foreclosed by the Federal Circuit's decision in *C.B.C. Enters. v. United States,* 978 F.2d 669 (Fed.Cir. 1992).[7] *C.B.C.* soundly rejected the argu-

---

7. Because plaintiff has failed to establish that the Government caused any delay related to drywall

installation independent of the UPH design defi-

ment that an *Eichleay* recovery is allowable "in any instance in which a contract modification results in an erosion of direct costs because a percentage mark-up of the decreased additional direct costs will not allocate a fair proportion of home office overhead to the contract." *Id.* at 674. "The *raison d'etre* of *Eichleay* requires at least some element of uncertainty arising from suspension, disruption or delay of contract performance. Such delays are sudden, sporadic and of uncertain duration. As a result, it is impractical for the contractor to take on other work during these delays." *Id.* at 675.

Plaintiff concedes that the increase in contract price ordered by Modification Nos. 0014 and 0015 included amounts for home office overhead and field office overhead requested in plaintiff's change order proposals. Nevertheless, plaintiff insists that "compensation allowed for home office and field office overhead was expressed as a percentage of the dollar amount of work to be completed and was specifically not Eichleay calculations for delay damages." Pl.'s Br. filed May 31, 2002, at 13. Modification No. 0020 further extended the contract 46 days for the work changed in Modification No. 0014, and Modification No. 0025 extended the contract two days to allow for the ordering of materials. As in *C.B.C.* the parties negotiated a change order that extended contract performance for a brief certain period of time. *See* 978 F.2d at 675. Plaintiff makes no allegation that it experienced any suspension of work, any idle time, or any uncertain period of delay. *See id.* "Where no element of uncertainty is imposed on the contractor, use of the *Eichleay* formula to calculate extended home office overhead is not permissible." *Id.*

Plaintiff also has failed to offer any evidence that it was on standby during any delay related to the fabrication of glued-laminated beams or carpentry work. Plaintiff's opposition brief, as well as its affidavits, confirm that plaintiff was at no time required to delay contract performance indefinitely, thereby causing unabsorbed or extended indirect costs. To the contrary, plaintiff received a steady stream of payments for the direct costs associated with other aspects of the contract. Plaintiff relies primarily on the affidavit of Mr. Breaux, who avers: "It is true that other work was being performed on the job but not on the UPH Barracks, and, it was not with the same skilled labor required to erect the glu-lam members, trusses and framing." Breaux Affidavit ¶ 4.

The construction of the Family Housing was supposed to proceed simultaneously with the construction of the UPH Barracks. Had the glu-lam submittal (submitted on September 9, 1997) been approved in 14 calendar days as required by the contract documents (September 23, 1997), Vicari could have received the glu-lam beams on or about October 28, 1997, and would have been back on tract as originally scheduled. Vicari was, as a practical matter and in reality, stopped from working and placed on standby. The work schedule changed from a project which was not phased, forcing Vicari to proceed as though the job were to be completed in phases, phase 1 being the Family Housing followed by phase 2, the UPH Barracks. Pl.'s Br. filed May 31, 2002, at 12 (citations omitted). In response to defendant's motion, plaintiff was required to do more than argue that it was not able to staff the contract as originally planned. To withstand summary judgment, plaintiff needed to offer some evidence that it suffered a delay that required plaintiff to stand by, that is, to be ready to resume work on the UPH Barracks immediately on the USCG's instruction. Such evidence is required to justify the presumption that plaintiff was unable to reduce its indirect costs or take on replacement work that would absorb those indirect costs. *Mech–Con Corp. v. West,* 61 F.3d 883, 886 (Fed.Cir. 1995).

Plaintiff's argument is similar to that rejected by the Federal Circuit in *Melka Marine.* The contractor in that case held a contract for dredging work as well as various construction and repair work. The Government was unable to obtain the necessary permits in order for the contractor to commence the dredging work, and the Government ultimately issued a formal suspension of that portion of the contract. Although the

ciencies, *inter alia,* plaintiff cannot recover for

drywall delays under *Eichleay.*

Government's failure to obtain the necessary permit required the contractor to re-sequence its work schedule and delayed the completion of the contract, the contractor immediately began performing the re-sequenced repair work. The contractor argued that because the dredging work accounted for a significant amount of the work in the contract, the Government's indefinite suspension of that work placed the contractor on standby. *Melka Marine*, 187 F.3d at 1375. The Federal Circuit rejected the contractor's *Eichleay* claim, reasoning that the contractor "cannot establish that it was on standby by dividing the contract into one portion that was able to be performed (the repairs) and another that was on standby (the dredging and breakwater work), because the contract required that both types of work be performed." *Id.* at 1376. The Federal Circuit concluded that, "[i]f work on the contract continues uninterrupted, albeit in a different order than originally planned, the contractor is not on standby." *Id.*

Assuming that the Government's conduct caused a delay for which an extension should be granted, plaintiff has offered no evidence that the delay affected its direct cost stream. Moreover, indirect costs "are only unabsorbed, and thus only compensable, to the extent they accrue during the extension period because a contractor must continue work on that contract to make up for standing by throughout an unexpected suspension caused by the government." *All State Boiler*, 146 F.3d at 1381. Plaintiff has offered no evidence that it was ever on standby, nor has it offered any evidence that indirect costs were unabsorbed or underabsorbed because of any alleged delay caused by the Government.

### 4. *Punchlist items*

■ Defendant's motion for summary judgment with regard to plaintiff's claim for the cost of punchlist work fails to demonstrate the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. As a factual matter, plaintiff does allege that it performed at least part of the punchlist work. Defendant's assertion to the contrary is incorrect. In support of its allegation, plaintiff offers a January 31, 2000, letter from plaintiff to the contracting officer, returning the punchlist, indicating those items that plaintiff claimed to have completed as of January 26, 2000, and detailing progress towards the completion of certain other items. Plaintiff wrote to the contracting officer again on June 15, 2000, after issuance of Modification No. 0028, arguing that it had completed some of the work for which it was charged. It therefore remains disputed who actually completed the punchlist work.[8]

As a legal matter, and apart from the question whether the USCG ultimately performed the work, defendant has not established that the contracting officer acted appropriately. Defendant relies on FAR § 52.246–12 as the basis for the contracting officer's decision, but makes only a superficial application of that regulation to the facts of this case. Moreover, defendant offers no case law interpreting this regulation, let alone applying it to analogous facts.

In the absence of more complete briefing, the court is hesitant to offer any conclusions on the operation of FAR § 52.246–12. Suffice it to say that FAR § 52.246–12(f) requires the contractor to "without charge, replace or correct work found by the Government not to conform to contract requirements, unless in the public interest the Government consents to accept the work with an appropriate adjustment in contract price." Subsection (g) allows the Government to replace or correct rejected work and charge the cost to the contractor if the contractor does not promptly replace or correct rejected work.

Defendant does not explain the effect, if ✦ any, of the contracting officer's accepting the UPH Barracks on the USCG's right to charge plaintiff for the cost to complete rejected work. In the same letter demanding

---

**8.** Whether the contracting officer provided plaintiff with documentation that the work was performed in-house prior to issuing Modification No. 0028 is generally irrelevant. Plaintiff apparently contends that the contracting officer's failure to provide this documentation shows that she acted arbitrarily or in bad faith. Plaintiff need not go so far; for purposes of plaintiff's claim, the court addresses only when plaintiff reasonably should have completed the punchlist work and whether the work was performed by plaintiff or the USCG.

that plaintiff complete the punchlist work by February 24, 2000, the contracting officer advised plaintiff that the UPH Barracks were accepted effective December 21, 1999. FAR § 52.246–12(i) provides that "Acceptance shall be final and conclusive except for latent defects, fraud, gross mistakes amounting to fraud, or the Government's rights under any warranty or guarantee."

Defendant also does not establish that February 24, 2002, was a reasonable deadline for plaintiff to complete the punchlist work. Plaintiff's January 31, 2000 letter makes no mention of the contracting officer's deadline, but the correspondence in the record refers to numerous other letters between the parties concerning punchlist work that have not been submitted to the court. The extant correspondence does suggest that plaintiff believed that no action would be taken on punchlist items until March 28, 2000, when the parties were scheduled to meet. Whether that understanding was accurate, or even reasonable, remains to be proved.

### 5. *Liquidated damages*

 Because genuine issues of material fact exist with regard to certain of plaintiff's delay claims, defendant is not entitled to summary judgment on plaintiff's claim to recover liquidated damages. As defendant observes, plaintiff's entitlement to a return of liquidated damages depends on plaintiff's ability to establish excusable delay. *Sauer, Inc. v. Danzig*, 224 F.3d 1340, 1347 (Fed.Cir. 2000).

### CONCLUSION

Accordingly, based on the foregoing,

**IT IS ORDERED,** as follows:

1. Defendant's motion for summary judgment is denied with respect to plaintiff's claim in Count II for an 82–day extension of the contract completion date based on the Government's alleged delay of fabrication of the glued-laminated beams.

2. Defendant's motion for summary judgment is granted with respect to Count V of the amended complaint.

3. Defendant's motion for summary judgment is granted with respect to plaintiff's claims in Counts VI and VII of the amended complaint for extended general and administrative costs and extended job overhead costs.

4. Defendant's motion for summary judgment is granted to the extent that plaintiff's claims in Counts VI and VII of the amended complaint for drywall installation delays and carpentry delays were caused by the UPH design deficiencies.

5. Defendant's motion for summary judgment is denied with respect to plaintiff's claim in Count VI of the amended complaint for a 17–day extension of the contract completion date due to an alleged drywall shortage.

6. Defendant's motion for summary judgment is denied with respect to plaintiff's claim in Count VII of the amended complaint for a 45–day extension of the contract completion date and additional direct costs because of an alleged labor shortage.

7. Defendant's motion for summary judgment is denied with respect to plaintiff's claims in Count VIII and IX of the amended complaint.

8. The parties shall file a Joint Status Report by September 30, 2002, proposing a schedule for proceedings to resolve plaintiff's remaining claims.