ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of -- ) | |
| ) | |
| KBJ, Inc. ) | ASBCA No. 58512 |
| ) | |
| Under Contract No. NNC11CA18C ) | |

APPEARANCE FOR THE APPELLANT:      Joseph R. Spoonster, Esq.
                                                           Harpst Ross Ltd.
                                                           Uniontown, OH

APPEARANCES FOR THE GOVERNMENT:      Scott W. Barber, Esq.
                                                                NASA Chief Trial Attorney
                                                                Laura A. Henry, Esq.
                                                                Tamika S. Laldee, Esq.
                                                                MacAllister A. West, Esq.
                                                                Trial Attorneys
                                                                NASA Glenn Research Center, OH

OPINION BY ADMINISTRATIVE JUDGE SCOTT

Appellant, KBJ, Inc. (KBJ), appealed pursuant to the Contract Disputes Act (CDA), 41 U.S.C. §§ 7101-7109, from the contracting officer's (CO's) final decision denying its $558,791.33 suspension and delay claim under the captioned contract to replace two boilers at the National Aeronautics and Space Administration's (NASA's) Glenn Research Center (GRC). The Board conducted a two-day hearing in Cleveland, Ohio. We decide entitlement and quantum. For the reasons set forth below, we sustain the appeal in part and otherwise deny it.

FINDINGS OF FACT

1. On 16 March 2011 NASA awarded the subject contract, a section 8(a) set-aside, to KBJ in the firm-fixed-price of $3,621,900 (R4, tab 3 at 42, tab 5 at 59-60; tr. 2/18). Under the contract, KBJ was to remove and replace Boilers 3 and 4 at GRC's steam plant, based upon a design provided by NASA (R4, tab 5, attach. A at 122-102; tr. 2/18). The boilers, which were about 18 feet wide, 30 feet long, and 28 feet tall, operated 365 days of the year to provide heat and humidification to GRC's approximately 350-acre campus. They were critical to GRC's operations, including daily support of significant research projects and experiments. The steam plant was very old and the boilers needed to be upgraded to make the plant more cost-effective and functional. (Tr. 1/23, 127-29, 174, 2/18-19)

2. To facilitate installation of the replacement boilers, KBJ was required to demolish a portion of the existing masonry wall on one face of the steam plant building and, after installation of the new boilers, reconstruct the wall with new energy efficient light panels and an insulated overhead door. KBJ was also required to provide a new combustion air system for the steam plant; replace two low pressure steam condensate collection and return pumps with non-electric pressure-powered units with steam pressure equalization tanks; install new conduit and wire for new boiler fans and blowers; install compatible starters for the boiler in the motor control center; and replace low voltage electrical distribution panels and associated feeders. (R4, tab 5, attach. A at 122-007 to -008)

3. On 11 February 2011, prior to contract award, NASA issued solicitation Amendment No. 2, answering prospective bidders' questions (R4, tab 1 at 7-16). Question 18 asked whether NASA would consider a schedule extension "due to the boiler lead time," noting that the replacement boilers would be "delivered at just about the time NASA wants them to be activated." NASA had responded that its "intention is for the work to be complete per the solicitation." (*Id.* at 11)

4. The contract anticipated the presence of asbestos-containing materials during work performance and required KBJ to remove them. It provided that the asbestos work included the removal of 1,000 square feet of boiler insulation material. (R4, tab 5, attach. A at 122-008, -102) Pre-bid Question No. 14 had asked NASA to confirm that the 1,000 square feet of boiler asbestos abatement included the ductwork extending from the boilers. NASA responded that the "1000 sf should include abatement of all asbestos necessary to remove boilers 3 and 4 safely." (R4, tab 1 at 10; tr. 2/89) Kevin Stiles was NASA's project manager. At the time, he was employed by a private contractor that worked for NASA. According to Mr. Stiles, NASA had allotted for 1,000 square feet of asbestos for the project and, if additional asbestos were discovered, NASA planned to modify the contract to add abatement of that asbestos. (Tr. 2/5-6, 58-59) We find that the contract required KBJ to abate only 1,000 square feet of asbestos-containing boiler insulation material.

5. Contract clause H.12 provided that "[t]he Superintendent is considered essential to the work being performed under this contract" and it required that KBJ identify a superintendent who "shall be dedicated solely to this contract and shall be on site full time whenever work is being performed under this contract" (R4, tab 5 at 87).

6. The contract incorporated numerous Federal Acquisition Regulation (FAR) clauses, including FAR 52.233-1, DISPUTES (JUL 2002); FAR 52.242-14, SUSPENSION OF WORK (APR 1984); and FAR 52.243-4, CHANGES (JUN 2007) (R4, tab 5 at 67, 103). The Suspension of Work clause provided in pertinent part:

> (a) The [CO] may order the Contractor, in writing, to
> suspend, delay, or interrupt all or any part of the work of this

2

contract for the period of time that the [CO] determines appropriate for the convenience of the Government.

(b) If the performance of all or any part of the work is, for an unreasonable period of time, suspended, delayed, or interrupted (1) by an act of the [CO] in the administration of this contract, or (2) by the [CO's] failure to act within the time specified in this contract (or within a reasonable time if not specified), an adjustment shall be made for any increase in the cost of performance of this contract (excluding profit) necessarily caused by the unreasonable suspension, delay, or interruption, and the contract modified in writing accordingly. However, no adjustment shall be made under this clause for any suspension, delay, or interruption to the extent that performance would have been so suspended, delayed, or interrupted by any other cause, including the fault or negligence of the Contractor, or for which an equitable adjustment is provided for or excluded under any other term or condition of this contract.

7. NASA issued a notice to proceed to KBJ on 12 April 2011, which it received that day (R4, tab 25; compl. ¶ 12). KBJ was to complete performance within 180 calendar days from the issuance of the notice to proceed, i.e., by 9 October 2011 (R4, tab 5 at 67; tr. 1/76). From the point NASA approved the contractor's submittals for the new boilers, the lead time for boiler manufacture was typically four to six months (tr. 2/29).

8. KBJ submitted its initial construction schedule on 22 April 2011, which NASA did not approve, in part because it was difficult to determine the critical path (R4, tab 26; tr. 2/23-24). On 12 May 2011 KBJ resubmitted its schedule, which NASA approved on 13 May 2011 (ex. G-1; tr. 2/24). Under the approved schedule KBJ planned to begin boiler asbestos abatement on 19 May 2011 and complete boiler demolition by 18 July 2011. Foundation construction for the replacement boilers was to be complete by 28 July 2011. KBJ planned to begin boiler assembly on 13 June 2011 and to have replacement Boilers 4 and 3 on site on 12 and 26 August 2011, respectively. It planned to begin replacement boiler installation on 15 August 2011 and to complete work on them by 14 October 2011. The contract performance period, as planned, was to end on 4 November 2011. (Ex. G-1; compl. ¶ 14; gov't br. at 2; app. br. at 2, ¶ 9).

9. On 26 May 2011 Mr. Stiles gave what he described as a direction to KBJ:

Regarding the Repair Steam Plant Project, I have been instructed that we are to proceed as follows:

3

We are free to mobilize at the Steam Plant to perform work that can be started within a reasonable time frame after installing the barricades and to perform work that does not render any of the boilers non-functional at this point. We cannot make boilers 3 or 4 non-functional until we have the new boilers onsite (this includes removing the front wall).

We will be allowed to take boilers out for short periods (as long as the Steam Plant still remains operational) to replace panels, run new lines, etc[.], and we can do other work in the plant such as replace window[s], panels, etc. But we cannot take boilers 3 and 4 out of service completely unless we have the new boilers in the Cleveland area.

As your schedule stands now, this direction will require some changes.

(R4, tab 28) The direction (hereafter sometimes the "suspension directive") had not been part of the contract (R4, tab 5; tr. 1/65). It suspended boiler work for an indefinite period. According to Mr. Stiles, the reason for the suspension directive was:

[O]nce we approved the schedule, the NASA facilities management team took a step back and looked at the schedule again and said, well, do we really want to do this, especially given the age of the steam plant....

(Tr. 2/28) NASA reevaluated KBJ's construction schedule after NASA had approved it because NASA was concerned that potential delays due to unforeseen conditions and in the replacement boilers' fabrication would push the project into the winter. NASA then would not have enough steam to fulfill its operational needs. (Tr. 2/28-29) The "thought behind suspending the work on the two boilers until the new ones arrived on site[] was essentially to minimize risk to NASA" (tr. 2/28).

10. On 8 June 2011 KBS submitted a schedule to Mr. Stiles based upon NASA's direction to delay demolition of the existing boilers until the new boilers arrived in Cleveland. KBJ advised that materials storage must be arranged and inquired whether NASA would do so or whether KBJ should, subject to a change order. KBJ asked whether boiler demolition could begin once the new boilers were in fabrication, which would reduce the delay. It also stated that it would "proceed with the window replacement, electrical panel replacement, fire protection installation and water line installation later this summer in order not to extend our supervision duration and increase our costs." (R4, tab 29 at 427)

4

11. On 9 June 2011 KBJ resubmitted its schedule, under which boiler demolition would begin on 5 September 2011, replacement boiler installation would begin 12 October 2011 and testing of the boilers would be completed by 11 January 2012, with full project completion by 1 February 2012. KBJ stated that it would communicate with Mr. Stiles later regarding revising the schedule based upon starting demolition when the boilers were released for fabrication. (R4, tab 30)

12. On 13 June 2011 KBJ sent an alternate schedule to Mr. Stiles, based upon starting boiler demolition upon release of the replacement boilers, under which KBJ would begin demolition on 25 July 2011 and replacement boiler installation on 15 September 2011; complete boiler testing by 30 November 2011; and achieve full project completion by 21 December 2011. (R4, tab 31)

13. On 16 June 2011 Mr. Stiles responded that KBJ's 13 June 2011 schedule was unacceptable (R4, tab 32 at 440). NASA did not want to risk entering the winter months without functional boilers (tr. 2/36-37). Mr. Stiles directed KBJ to provide a schedule "detailing any work that [KBJ] would like to still accomplish this summer within the steam plant" without rendering Boilers 3 and 4 completely inoperable (R4, tab 32 at 440).

14. KBJ responded to Mr. Stiles on 20 June 2011 that:

> The activities that we would like to complete this year are as follows:
> 1) install combustion air platform
> 2) install combustion air units, ductwork and piping
> 3) install new water line
> 4) install fire protection system
> 5) window removal and kalwall/louver installation
> 6) option 3, 4 and 5 electrical panel replacement
> 7) relocation of Siemens panels on east wall per drawing ED-101, note 20
> 8) reroute mechanical and electrical systems on east wall for wall opening
> 9) remove radiant heaters and gas piping on east and south walls per drawing MD-102, note 28 & 29
>
> Please review the above list. If it is acceptable [KBJ] will finalize a work schedule.

(R4, tab 32 at 440)

15. Bilateral contract Modification (Mod.) No. 1, effective 27 June 2011, added steam header replacement to the contract work for an additional $769,344 (R4, tab 6 at

144-45; tr. 2/40). Although, at the time, the contract performance period was to end on 4 November 2011, the modification stated that the period "remains at: **August 31, 2012**," apparently intended as an extension of the period (R4, tab 6 at 145). The modification did not address NASA's 26 May 2011 suspension of boiler work. It concluded:

> The Parties hereto acknowledge and agree that any and all claims for equitable adjustment of the contract price and time pursuant to the provisions of the clause(s) 52.243-04 entitled "CHANGES", and Mutual Agreement are hereby fully satisfied and discharged with respect to this Supplemental Agreement Number One (01).

(R4, tab 6 at 145)

16. On 22 August 2011, NASA advised that KBJ was to have "100% dedicated supervision" on the project (R4, tab 34 at 443-44). At this time, only part of one of the activities listed by KBJ on 20 June 2011 had been completed (tr. 2/42). On 24 August 2011, Mr. Stiles inquired whether KBJ was "still planning to do any work inside the Steam Plant before Spring, i.e. electrical panels" (R4, tab 34 at 443). KBJ responded on 25 August 2011 that, based upon the overall project schedule, it would cease work on the electrical panel relocation shortly and would still install the waterline in September, with a full-time superintendent in place. It would resume work in early 2012 "after NASA provides a start date for demolition of boilers 3 and 4." (R4, tab 34 at 443) KBJ did not, however, install the waterline until 2012 (tr. 2/43).

17. On 12 September 2011 Mr. Stiles notified KBJ:

> For construction of the Steam Plant and Steam Header, the dates below are the official guidance from [Facilities Division]:
>
> **March 1, 2012**: Boiler 3 demolition can begin
> **April 16, 2012**: Begin South Header Replacement
> **June 1, 2012** (or upon completion of S. Header Replacement): Begin North Header and boiler 4 demo
> **Oct 1, 2012**: Boiler 4 complete, tested, running, etc. (Assuming boiler 4 install will be first based on Physical location in the Steam Plant)
> **Oct 15, 2012**: Boiler 3 complete, tested, running, etc.
> **Oct 15, 2012**: Front wall must be reconstructed

6

(R4, tab 35 at 445-46) Mr. Stiles reiterated NASA's requirement that the new boilers be in the Cleveland area prior to demolition of the existing boilers. He asked that KBJ submit an updated schedule based upon the dates provided. (*Id.* at 446)

18. Bilateral contract Mod. No. 3, effective 25 January 2012, for $35,731, added work related to the steam header replacement and extended the contract completion date to 31 December 2012. It stated that "claims for equitable adjustment of the contract price and time pursuant to the [Changes clause] and Mutual Agreement are hereby fully satisfied and discharged with respect to this Supplemental Agreement." (R4, tab 10)

19. KBJ submitted a revised schedule to Mr. Stiles on 22 February 2012 under which it planned to conduct boiler asbestos abatement from 19 March 2012 to 28 March 2012, replace the south steam header from 16 April 2012 to 11 May 2012, replace the north steam header from 14 May 2012 to 8 June 2012, demolish Boilers 3 and 4 between 4 June 2012 and 6 July 2012, and begin installation of Boilers 4 and 3 on 19 July and 2 August 2012 respectively. KBJ anticipated completing boiler testing by 3 October 2012, with a project completion date of 24 October 2012. (R4, tab 36)

20. On 24 February 2012, Mr. Stiles posed several questions and concerns to KBJ regarding its 22 February 2012 schedule. Among other issues, Mr. Stiles asked if KBJ could start the project sooner, subject to proper superintendence. In its 5 March 2012 response, KBJ advised that it had been told that Boiler 3 demolition could start immediately. It sought clarification, in view of Mr. Stiles' prior instruction that no demolition could take place until the replacement boilers were in the Cleveland area. (R4, tab 37; tr. 2/51-52)

21. Mr. Stiles replied on 6 March 2012 that KBJ could begin Boiler 3 demolition as soon as possible, without the replacement boilers in the Cleveland area. He also advised that KBJ should replace the north steam header prior to replacing the south steam header, due to NASA's desire to leave Boilers 1 and 2 operational during unpredictable April weather, and he asked for an updated schedule. (R4, tab 38 at 451)

22. Joseph Williams became KBJ's project superintendent between 13 and 20 March 2012 (*see* R4, tab 39 at 453, tabs 40-41; tr. 1/14, 2/55-56).

23. KBJ sent an updated schedule to Mr. Stiles on 23 March 2012 with changes they had discussed. As with the 22 February 2012 schedule, KBJ projected a project completion date of 24 October 2012. (R4, tab 42)

24. KBJ planned to mobilize its asbestos abatement subcontractor, Neumeyer Environmental Services (Neumeyer), during the week of 26 March 2012 (R4, tab 41 at 457). By mid-April 2012, KBJ had begun demolition of the existing boilers (tr. 2/60).

25. On 17 April 2012 KBJ submitted to Mr. Stiles Request for Information No. 25 indicating additional asbestos at Boiler 3, attaching a report analyzing a sample, and recommending that a more comprehensive survey be undertaken (R4, tab 43 at 462-69). A 5 May 2011 report shows that NASA's original survey of Boiler 3 did not detect any asbestos (id. at 471-74). Ultimately NASA confirmed that there was additional asbestos at Boiler 3 (tr. 2/60).

26. The replacement boilers were delivered to the Cleveland area on or about 8 May 2012 (R4, tab 44; tr. 2/60-61).

27. KBJ submitted a 23 May 2012 proposal to abate the additional asbestos-containing insulation discovered at Boiler 3 for $74,250. KBJ's proposal included $67,500 in subcontractor costs plus five percent markups each for overhead and profit. (R4, tab 47)

28. In response to Mr. Stiles' 24 May 2012 request for a more detailed cost breakdown, KBJ provided a 4 June 2012 proposal with more cost breakdown, at an increased price of $74,568 (R4, tab 48 at 485, 488-92).

29. As the project progressed, KBJ continued to discover additional asbestos-containing material in the boilers (tr. 2/63-64). By 5 June 2012, the project was behind schedule due to the unforeseen asbestos (R4, tab 50).

30. On 11 June 2012, KBJ submitted three proposals for additional asbestos abatement at Boilers 3 and 4. KBJ would abate the asbestos and demolish each boiler in nine weeks, using five eight-hour shifts per week, for $826,885; or it would do so in seven weeks, using five ten-hour shifts and one eight-hour shift per week, for $1,000,950; or it would do so in five and a half weeks, using ten ten-hour shifts per week, for $1,128,138. (R4, tab 52 at 500-14).

31. KBJ submitted two 21 June 2012 proposals to abate additional asbestos found at Boilers 3 and 4 for $25,870 and $136,256, respectively (R4, tab 59). On 12 July 2012, KBJ also submitted a $21,450 proposal to abate additional asbestos found at Boiler 3 (R4, tab 60 at 541-44).

32. Commencing on 27 July 2012, NASA asked KBJ for a proposal to abate even more asbestos (see R4, tab 61 at 545, tab 64 at 553, 555). The minutes of a 31 July 2012 construction progress meeting note a concern, which we infer KBJ raised, that "[a]ll the 'start/stop' is impacting the job, slowing down progress'" (R4, tab 62 at 549).

33. Bilateral contract Mod. No. 5, effective 2 August 2012, in the amount of $258,937, covered additional work, including the abatement work in KBJ's 23 May, 21 June and 12 July 2012 proposals. The modification stated that it was entered into

8

under the Changes clause and mutual agreement and that it was a "Supplemental Agreement for work within scope" (R4, tab 14 at 280). The contract completion date remained 31 December 2012. Mod. No. 5 did not refer to the suspension directive or cover any delays relating thereto. It stated that the parties "acknowledge and agree that any and all claims for equitable adjustment of the contract price and time pursuant to the [Changes clause] and Mutual Agreement are hereby fully satisfied and discharged with respect to this Supplemental Agreement" (id. at 281).

34. On 3 August 2012 KBJ submitted a proposal for $639,898 to fully contain Boilers 3 and 4 and completely abate the asbestos in the boilers (R4, tab 64).

35. Mr. Stiles warned KBJ on 6 August 2012 that proposed work done prior to NASA's proposal acceptance would be at KBJ's risk (R4, tab 65). KBJ replied that day:

> I think at this point we need to stop Neumeyer then....we were trying to keep the project going [i]n good faith. We have lost time and money on all of this unforeseen asbestos. We have paid for overtime to help get the project back on schedule. I cannot absorb anymore additional cost. Neumeyer will be on site tomorrow to finish a few things and clean up. I will not bring him back on site until we reach an agreement on the additional asbestos. At this point, we cannot go any further.

(R4, tab 66 at 561)

36. By letter to Mr. Stiles of 10 August 2012, KBJ stated that, at a 31 July 2012 meeting to discuss removal of additional asbestos, KBJ was "given a verbal to continue working, to keep the project/schedule moving forward" and was asked to submit its proposal by 3 August 2012; KBJ complied but on 6 August 2012 NASA advised that KBJ would proceed at its own risk (R4, tab 68 at 565). KBJ stated:

> As of today...we still have not received direction from NASA expressing their intentions on how to remedy [the asbestos] issue. All this additional, unforeseen asbestos has caused schedule delays, which in turn has pushed the completion date beyond October 31, 2012. We need to receive a response from NASA today. We will need to discuss the schedule extension and additional costs associated with the schedule extension.

(Id.)

9

37. NASA ultimately determined that KBJ's 3 August 2012 proposal was too high (tr. 2/71). NASA developed an 8 August 2012 internal estimate that the remaining asbestos work should cost $326,364 (R4, tab 73; tr. 2/71-73). NASA also obtained a 13 August 2012 proposal from a different company to do the work for $183,750 (R4, tab 72 at 575-77; tr. 2/72-73). NASA provided both figures to KBJ and advised that NASA was willing to agree to its own estimated price for the asbestos work (tr. 2/72).

38. By letter to Mr. Stiles of 17 August 2012, KBJ stated:

> We have agreed to accept NASA's offer of $326,364.00 plus KBJ's mark up to fully contain boiler 3 and 4, and remove the remainder of the asbestos previously identified. The price to complete the subject work is $368,788.... [O]nce we remobilize, we cannot encounter any additional work stoppages.

(R4, tab 70 at 568) KBJ's markup included bond at 2%, overhead and profit at 5% each, and project superintendent costs of $3,250 (*id.* at 569).

39. On 20 August 2012, KBJ agreed to accept NASA's $326,364.00 offer, without the markup KBJ had originally added (R4, tab 71).

40. Bilateral contract Mod. No. 6, effective 29 August 2012, in the amount of $326,364, added the remaining asbestos work, including full containment of the boilers. It stated that it was entered into under the Changes clause and mutual agreement and that it was a "Supplemental Agreement for work within scope" (R4, tab 16 at 315). The contract completion date remained 31 December 2012. The modification did not refer to the suspension directive or related delays. It stated that the parties "acknowledge and agree that any and all claims for equitable adjustment of the contract price and time pursuant to the [Changes clause] and Mutual Agreement are hereby fully satisfied and discharged with respect to this Supplemental Agreement" (R4, tab 16 at 316). KBJ has not alleged that there was any additional asbestos work beyond that covered by Mod. No. 5 (finding 33) and Mod. No. 6.

41. By letter to CO Erick N. Lupson dated 19 September 2012, KBJ stated:

> As a recap to our recent discussions over [Mod. No. 6], the Project schedule, and time extension impacts to KBJ – this letter confirms that NASA acknowledges that KBJ is not in agreement with the new December 31, 2012 completion date set forth in [Mod. No. 6]. In fact, KBJ has notified NASA (via the revised schedule which was provided before [Mod. No. 6] was issued and in our recent meetings) that in light of

10

the additional asbestos abatement and associated critical path delays, the Project cannot be completed until February 28, 2013.

KBJ reserves all rights associated with seeking an equitable adjustment in both its contract price and contract time due to the asbestos-abatement delays that were outside of KBJ's scope of work and control. KBJ is preparing and will be submitting shortly a request for equitable adjustment for its indirect time extension/delay costs that exceed the direct costs of $326,360 [sic] contained in [Mod. No. 6]. KBJ is asserting its right to further adjustment pursuant to [the Changes clause].

(Ex. A-60)

42. By letter to the CO dated 4 October 2012, a Thursday, KBJ submitted a certified claim for $558,791.33 and a time extension to 28 February 2013, stating that the claim was comprised of a schedule analysis and damages calculated by its consultant, "Timothy T. Calvey, PE, PSP, CPE" (R4, tab 20 at 388). The manner by which KBJ sent the claim letter and the date the CO received it are not of record. We infer that, even if sent by regular mail, he would have received it by Monday, 8 October 2012. The claim cited the Changes clause but referred to NASA's work suspensions. KBJ stated that the claim was based upon asbestos-abatement delays that were outside its scope of work and control, and upon NASA's early project suspension in 2011. KBJ sought, *inter alia*, to recover its general and administrative (G&A) costs associated with the "unanticipated NASA-caused suspension of the work" (*id.* at 390). KBJ reiterated its contention that NASA had acknowledged that KBJ did not agree with Mod. No. 6's 31 December 2012 completion date. KBJ sought $53,833.33 in additional subcontractor and materials costs for the period it was suspended, measured from 24 October 2012, which included its overhead and profit at 5% each and bond at 2%. It also claimed $371,909 in home office overhead, calculated at a daily rate of $1,047.63, multiplied by 355 days of alleged delay resulting from NASA's project suspension due to "operability concerns with Boiler Nos. 3 and 4 during the winter of 2011" (*id.* at 389). KBJ used the *Eichleay*[1] formula in calculating its suspension and delay claim (*id.*; tr. 1/43). Using the same $1,047.63 daily rate, KBJ also sought $133,049 in home office overhead for 127 days of alleged asbestos-related delays from "the post-suspension agreed upon completion date of October 24, 2012 through [KBJ's projected] completion date of February 28, 2013" (R4, tab 20 at 393). KBJ included a comparison of its initial schedule, the schedule following the suspension, and a schedule reflecting the alleged additional asbestos impacts (*id.* at 392).

---

[1] *See Eichleay Corp.*, ASBCA No. 5183, 60-2 BCA ¶ 2688 at 13,568, *aff'd on recon.*, 61-1 BCA ¶ 2894, discussed below.

11

43. The CO denied KBJ's claim on 30 November 2012, based principally upon alleged releases in the contract modifications although, unlike in the modifications, the release language he quoted referred to the Disputes clause as well as the Changes clause (R4, tab 22 at 397).[2] On 18 January 2013 KBJ appealed to the Board, which docketed the appeal as ASBCA No. 58512. On 16 October 2014 NASA terminated the contract for default and asserted a monetary claim against KBJ (R4, tab 95). KBJ's appeal from that decision, docketed as ASBCA No. 59785, is subject to separate proceedings.

44. KBJ proffered Mr. Calvey, vice president of Calvey Consulting, LLC, identified in its claim, as an expert witness. He has a Bachelor of Science degree in engineering, a Master's degree in business administration and, among other credentials, is a registered professional engineer, certified professional estimator, and certified planning and scheduling professional. He has over 30 years of pertinent professional experience. He has lectured and published articles on construction claims, schedule analysis and delays and has previously testified as an expert witness. As his expert report, he relied upon his claim analysis and a Microsoft PowerPoint presentation that referred to exhibits. He submitted his curriculum vitae, his agreement with KBJ, and his invoices. Over NASA's objection, the presiding judge admitted Mr. Calvey as an expert in schedule and damage analysis. (Tr. 1/41-52, 97, exs. A-61, -62; Bd. corr., app. witness list) NASA did not proffer an expert and did not engage in any discovery or ask to do so (see tr. 2/121).

45. Mr. Calvey opined that the project's critical path consisted of demolishing the existing boilers, new piping installation, new boilers installation, connecting piping to the boilers, boilers insulation, and starting the boilers, and that delaying removal of the existing boilers would impact the project's completion date. (Tr. 1/72-74) KBJ's superintendent, Mr. Williams, and NASA's Mr. Stiles, similarly testified that the project's critical path consisted of demolition of the existing boilers and installation of the replacements (tr. 1/14-15, 2/89). We find that the project's critical path consisted of the demolition, followed by the replacement, of Boilers 3 and 4.

46. Mr. Calvey testified that KBJ originally planned to demolish Boilers 3 and 4 prior to the delivery of the new boilers and that NASA's suspension directive that Boilers 3 and 4 must remain functional until the replacement boilers were in the Cleveland area resulted in a project delay (tr. 1/65, 67; finding 9). He stated that KBJ did not know when it could start work again until NASA's 12 September 2011 notification that it could begin demolition of Boiler 3 on 1 March 2012 (tr. 1/79; finding 17). Mr. Calvey stated that the new boilers had been assembled and payment for the assembly had occurred in August 2011, so the boilers could have been installed per KBJ's original

---

[2] The CO stated that KBJ had reduced its claim from $558,791.53 to $508,000.00 but KBJ characterized the latter figure as a counter settlement offer in response to an informal offer from NASA (R4, tab 21).

12

schedule but for the NASA-imposed delay in boiler demolition (tr. 1/69, 81-82). Relying upon KBJ's contemporaneous schedules, Mr. Calvey opined that the delay in Boilers 3 and 4 demolition pushed the project completion date from 4 November 2011 to 24 October 2012 (tr. 1/82-83), a total of 355 days.

47. Concerning the alleged delay stemming from NASA's suspension directive, CO Lupson testified that, from his understanding, there had been other work that had to be performed prior to the boilers' demolition (tr. 1/158). However, he mentioned only window work and other work that "wasn't really related to the boilers," stating that he could not be specific because he lacked the technical expertise (tr. 1/165).

48. Mr. Stiles noted that KBJ had identified nine activities other than boiler work that it could perform during 2011 (tr. 2/36; finding 14). He acknowledged that some of that work could have been impacted by the boiler work, but testified that the majority of it could have been completed in 2011 (tr. 2/90).

49. KBJ's superintendent Williams countered that the nine activities could not have been accomplished in 2011. Although he arrived in March 2012, he testified that he was aware of the 2011 site conditions and, because the boiler room work had not been performed, conditions were the same in March 2012 as they would have been in September 2011 (when NASA notified KBJ of the date it could begin boiler demolition). (Tr. 2/110-15; finding 17)

50. We find that NASA's suspension directive to KBJ to refrain from demolishing Boilers 3 and 4 until the replacement boilers were on site delayed the project's critical path work by 109 days as set forth below. We do not accept Mr. Calvey's reliance upon KBJ's contemporaneous schedules to determine the length of the delay. The record supports a different calculation. NASA informed KBJ that it could begin demolition of Boiler 3 on 1 March 2012 (finding 17). KBJ's contemporaneous schedules projected a completion date of 24 October 2012 (findings 19, 23). The difference between the 1 March 2012 and 24 October 2012 dates is 237 days, longer that the original 180-day contract performance period. Mr. Calvey did not explain how all of those extra days were attributable to NASA's suspension of boiler activities. We attribute the delay between NASA's 26 May 2011 directive to KBJ not to demolish the existing boilers and its 1 March 2012 demolition commencement date, a total of 280 days, to the government. That delay was indefinite for 109 days, from 26 May 2011 until NASA's 12 September 2011 notice to KBJ that it could begin Boiler 3 demolition on 1 March 2012. It was for a definite period thereafter. We attribute the delays between 1 March 2012 and the start of Boiler 3 demolition to KBJ. KBJ's 5 March 2012 inquiry to NASA about the requirement that replacement boilers be in the Cleveland area before demolition of Boilers 3 and 4 could begin suggests that the replacement boilers were not yet on site (finding 20). However, Mr. Calvey testified that the new boilers had been assembled in August 2011 (finding 46). KBJ gave no explanation why they could not have been

13

brought to the Cleveland area upon, or at a reasonable time after, NASA's 12 September 2011 notice that KBJ could begin demolition on 1 March 2012. KBJ has not explained the delay in delivery of the replacement boilers until May 2012. It was only able to start demolition work sooner because NASA revoked its instruction that the replacement boilers first be in the Cleveland area (finding 21).

51. We find KBJ responsible for the delay in the non-boiler work KBJ identified to NASA on 20 June 2011 as work that could be performed while the boiler work was suspended (finding 14). Although Mr. Williams testified that the work could not have been performed in 2011 (finding 49), he was not KBJ's superintendent until March 2012 (finding 22), and we credit KBJ's contemporaneous statement about the work that could be performed in 2011. KBJ has presented no evidence that the delay in completing that work was caused by NASA. The record is insufficient for us to calculate that delay. Regardless, the project's critical path was driven by the boiler work (*see* finding 45). We find that this non-boiler work was not on the critical path and was insubstantial in comparison to the contract work as a whole.

52. Mr. Calvey opined that NASA delayed the project by its "lack of decision on the asbestos and the added scope of asbestos that was not included in the original contract scope" (tr. 1/96), and that this delayed the critical path work and extended the project's completion date from 24 October 2012 to 28 February 2013 (tr. 1/89, 95-96), a total of 127 days. He did not apportion this delay between the delay in issuing the contract modifications to add the asbestos work and the time necessary to perform that additional work. The contract required KBJ to abate 1,000 square feet of asbestos-containing boiler insulation material (finding 4). Because KBJ could not complete boiler demolition, a critical path item, without abating the asbestos, we attribute the delays caused by the additional asbestos encountered to NASA. We accept Mr. Calvey's unrebutted testimony that NASA's delay in deciding how to address the additional asbestos and the added abatement together delayed the project by 127 days.

53. NASA contends that KBJ could obtain replacement work during the delay period because, on 7 June 2012 it selected KBJ for an $86,125 project (R4, tab 75 at 584; tr. 2/76-77); on 3 August 2012 KBJ bid $525,805.52 on a GRC project, although its bid was unsuccessful (R4, tab 76; gov't br. at 19); and on 19 September 2012, NASA selected KBJ for a $171,574 project (R4, tab 77 at 606). The total $783,504.52 value of these projects, including the largest one for $525,805.52 that KBJ was not awarded, was $783,504.52. This is less than half the $3,621,900 value of the subject steam plant contract as originally awarded (finding 1).

14

54. KBJ submitted proposals from its subcontractors seeking additional compensation for being delayed until 2012 (ex. A-56). Mr. Calvey added the subcontractors' requested amounts to arrive at the $53,833.33 subcontractor and materials costs sought by KBJ in its claim (tr. 1/102; finding 42). We find the subcontractor' proposals insufficient to show either that their labor and material costs actually increased or the extent of any such increase. Because KBJ offered no other evidence on these points, it has failed to prove any subcontractor cost escalation.

55. KBJ seeks to recover unabsorbed overhead costs pursuant to the *Eichleay* formula. Mr. Calvey computed a $1,047.63 daily overhead rate (R4, tab 20 at 390; tr. 1/99). NASA does not challenge this calculation or offer an alternate one. We adopt the unchallenged $1,047.63 daily overhead rate and, as we discuss below, conclude that KBJ is entitled to recover 109 days of unabsorbed overhead costs resulting from NASA's suspension of demolition of Boilers 3 and 4.

## DISCUSSION

### Preliminary Evidentiary Issues

### I. NASA's Objection to Admission of Mr. Williams' Disputed Testimony

At the hearing, NASA objected to testimony by Mr. Williams regarding whether work KBJ identified to NASA on 20 June 2011 could have been accomplished in 2011. Because Mr. Williams was hired in March 2012, NASA argued that he lacked requisite personal knowledge to give such testimony. The presiding judge overruled NASA's objection. (Tr. 2/109-12) In its brief, NASA renews its objection to Mr. Williams' testimony regarding events prior to March 2012 as outside his personal knowledge, citing, *inter alia*, FED. R. EVID. 701(a) (gov't br. at 62-63).

FED. R. EVID. 701(a) provides that lay opinion testimony must be "rationally based on the witness's perception." Under FED. R. EVID. 602, a "witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter," but "[e]vidence to prove personal knowledge may consist of the witness's own testimony." Although we may look to them for guidance, the Federal Rules of Evidence are not binding upon the Board. Board Rule 10(c); *Laguna Constr. Co.*, ASBCA No. 58324, 14-1 BCA ¶ 35,748 at 174,947-48. In keeping with Board Rule 10(c), in addition to appropriate evidence admissible under the Federal Rules, the Board will consider evidence admissible in the sound discretion of the presiding judge.

15

In any event, NASA has not demonstrated any prejudice to it resulting from the Board's admission of the disputed testimony. The Board was not persuaded by it and gave weight instead to KBJ's contemporaneous evaluation of the work it could do in 2011 (findings 14, 51). We deny NASA's objection.

## II. NASA's Objection to Board's Admission of Mr. Calvey as an Expert

The Board's pre-hearing order provided that if a party offered expert testimony, it was to provide a statement setting forth the expert's area of expertise; the subject matter of the expert's testimony; and a summary of the expert's opinion and the basis therefor in the form of an expert's report. The order referred the parties "generally" to FED. R. CIV. P. 26 and FED. R. EVID. 702-705. KBJ, then proceeding *pro se*, timely submitted its witness list one month before the hearing, stating that: Mr. Calvey would "provide expert testimony on schedule analysis and damage calculations;" the claim contained a summary of his opinions; and they were "based on the project schedules, daily logs, project correspondence and company financial records." KBJ provided a summary of Mr. Calvey's credentials and included a copy of his curriculum vitae. KBJ also submitted a copy of its hearing exhibits. Exhibit A-61, "Calvey Consulting Charts," was a printout of his PowerPoint presentation. (*See* finding 44)

Prior to the hearing NASA objected to the designation of Mr. Calvey as KBJ's expert witness on the ground that the information in its witness list did not satisfy FED. R. CIV. P. 26's expert report requirements. KBJ then submitted a list of Mr. Calvey's publications, cases in which he had testified as an expert, and information regarding his compensation related to this appeal (*see* finding 44). NASA renewed its objection at the hearing (tr. 1/44, 46, 49-51). The presiding judge overruled it, allowing Mr. Calvey to adopt the schedule analysis and damages calculation in KBJ's claim and exhibit A-61 as his expert report under the circumstances of this appeal (tr. 1/47-49, 51). NASA renewed its objection in its post-hearing brief (gov't br. at 63-67).

Like the Federal Rules of Evidence, although we may look to them for guidance, particularly in areas our rules do not specifically address, the Federal Rules of Civil Procedure do not apply to the Board. *Circle, LLC*, ASBCA No. 58575, 15-1 BCA ¶ 36,025 at 175,965. As noted, under Board Rule 10(a), evidence may be admitted in the presiding judge's discretion. While Mr. Calvey did not provide a signed expert report so-designated, we conclude that the materials he submitted satisfied the Board's pre-hearing order and that the presiding judge had ample basis for admitting him as an expert witness. NASA did not engage in discovery or ask to do so regarding Mr. Calvey, who was identified in KBJ's claim. (Finding 44)

16

We deny NASA's objection to the presiding judge's admission of Mr. Calvey as an expert witness.[3]

## KBJ's Entitlement to an Equitable Adjustment

KBJ seeks subcontract escalation costs and unabsorbed overhead for the delay resulting from NASA's suspension directive that Boilers 3 and 4 could not be demolished until replacement boilers were in the Cleveland area, which was not a contract requirement (finding 9). It also seeks unabsorbed overhead for the delay due to the several occurrences of additional asbestos beyond the 1,000 square feet covered by the contract (finding 4).

NASA alleges that: KBJ has failed to establish that NASA's suspension directive unreasonably delayed project completion; KBJ caused concurrent delays; NASA fully compensated KBJ under the clear and unambiguous Mod. Nos. 5 and 6 for asbestos-related impact and delay costs and those claims are barred by the doctrine of accord and satisfaction; KBJ is not entitled to increased subcontractor costs; and KBJ has not established entitlement to *Eichleay* damages.

KBJ disputes NASA's contentions and asserts that its asbestos-related delay claims were not addressed or resolved by the contract modifications. It contends that the modifications did not put it on notice that NASA intended them to encompass matters other than direct costs of the subject changed work.

KBJ has not proved that its subcontractor costs increased (finding 54) and that unsupported aspect of its claim fails. Accordingly, we address only KBJ's unabsorbed overhead claims. Mod. Nos. 5 and 6, and the release language they contain, do not refer

---

[3] NASA also makes procedural objections. It objects to the duplication in KBJ's exhibits of documents already contained in NASA's Rule 4 file (gov't br. at 67-68). KBJ bore the extra duplication costs and, when there has been duplication, we have relied upon the Rule 4 file. NASA also objects to having been required to file its post-hearing brief first, which it agreed to do at the close of the hearing at the presiding judge's request. Because KBJ, a small business, was then appearing *pro se*, the judge determined that having NASA file the first brief would be most helpful to the Board and serve as briefing guidance to KBJ. KBJ later retained counsel but the Board declined NASA's request that it alter its briefing order. NASA argues that this placed it "in an inequitable position regarding the ultimate burden of proof" (gov't br. at 69). The order of briefing does not alter KBJ's burden of proof. Moreover, NASA was not prejudiced. It had ample opportunity in its reply brief to respond to KBJ's arguments. NASA's procedural objections are denied.

to the suspension directive or cover alleged delays relating thereto (*see* findings 33, 40) and NASA does not so claim. We address those delays first.

In addition to direct costs of contract performance, "a government contractor incurs indirect costs which are not attributable to one contract in particular but arise because of its general operations." *West v. All State Boiler, Inc.*, 146 F.3d 1368, 1372 (Fed. Cir. 1998). Home office overhead costs are:

> [T]hose that are expended for the benefit of the whole business, which by their nature cannot be attributed or charged to any particular contract. In contracting with the government, a company necessarily includes a portion of home office overhead expenses, which it calculates based on the contract's duration, in its estimate of costs to perform the contract.

*Altmayer v. Johnson*, 79 F.3d 1129, 1132 (Fed. Cir. 1996) (citations omitted). A contractor recovers these costs by allocating them on a proportionate basis among all its contracts. *All State Boiler*, 146 F.3d at 1372; *B.V. Construction, Inc.*, ASBCA No. 47766 *et al.*, 04-1 BCA ¶ 32,604 at 161,358. Suspension or delay of contract performance results in an interruption in payment for direct costs, which in turn causes an interruption in payment for overhead; however, overhead costs continue to accrue regardless of direct contract activity. This interruption in the stream of payments causes a portion of home office overhead costs to be unabsorbed. *Nicon, Inc. v. United States*, 331 F.3d 878, 882 (Fed. Cir. 2003); *Wickham Contracting Co. v. Fischer*, 12 F.3d 1574, 1577 (Fed. Cir. 1994). The *Eichleay* formula estimates "proportionate home office overhead that may be unabsorbed due to suspension." *B.V. Construction*, 04-1 BCA ¶ 32,604 at 161,358. It approximates unabsorbed home office overhead costs "by calculating a daily overhead dollar amount for the contract in question and multiplying that figure by the number of days of delay." *Altmayer*, 79 F.3d at 1132-33.

Recovery of unabsorbed overhead under *Eichleay*, however, is an extraordinary remedy. *Charles G. Williams Constr., Inc. v. White*, 271 F.3d 1055, 1058 (Fed. Cir. 2001). The contractor must meet three prerequisites. It must show that (1) there was a government-caused delay to contract performance of uncertain duration that was not concurrent with a delay caused by the contractor or some other reason; (2) the delay extended the performance time, or the contractor completed the work on time but incurred additional costs because it had planned to finish earlier; and (3) the contractor was required to be on standby during the delay.

Concerning concurrent delay, "[t]he contractor generally cannot recover for concurrent delays for the simple reason that no causal link can be shown: A government act that delays part of the contract performance does not delay the general progress of the

18

work when the prosecution of the work as a whole would have been delayed regardless of the government's act." *Essex Electro Eng'rs, Inc. v. Danzig*, 224 F.3d 1283, 1295 (Fed. Cir. 2000) (citation and internal quotation marks omitted). Moreover, only work on the critical path can delay contract completion. *Webb Electric Co. of Florida, Inc.*, ASBCA No. 54293, 07-2 BCA ¶ 33,717 at 166,940, *aff'd, Webb Electric Co. of Florida v. Griffin*, 299 F. App'x 958 (Fed. Cir. 2008). In evaluating a contractor's entitlement to recover for government-caused delays, the contractor is not charged for its concurrent delays that do not affect work on the critical path. *Fischbach & Moore International Corp.*, ASBCA No. 18146, 77-1 BCA ¶ 12,300 at 59,224, *aff'd, Fischbach & Moore International Corp. v. United States*, 617 F.2d 223 (Ct. Cl. 1980).

As to standby, "[t]he proper standby test focuses on the delay or suspension of contract performance for an uncertain duration, during which a contractor is required to remain ready to perform." *Interstate General Government Contractors, Inc. v. West*, 12 F.3d 1053, 1058 (Fed. Cir. 1993). When the period of delay is uncertain "and the contractor is required by the government to remain ready to resume performance on short notice, the contractor is effectively prohibited from mitigating such overhead costs by making reductions in home office staff or facilities." *Id.* at 1057-58. A contractor meets the standby requirement when the CO "has issued a written order that suspends all the work on the contract for an uncertain duration and requires the contractor to remain ready to resume work immediately or on short notice." *P.J. Dick*, 324 F.3d at 1371. Alternatively, a contractor can establish standby by indirect evidence, which requires a showing that: (1) the government-caused delay was substantial and of indefinite duration; (2) during the delay, the contractor had to be ready to resume work on the contract immediately, at full speed; and (3) there was an effective suspension of much, if not all, of the contract work. *Id.*

When a contractor has established the prerequisites to applying *Eichleay*, it has made a prima facie case of entitlement. The burden of production then shifts to the government to show that it was not impracticable for the contractor to take on replacement work and mitigate its damages. The contractor, however, retains the ultimate burden of persuasion that it was impracticable for it to obtain replacement work. *Nicon*, 331 F.3d at 883; *P.J. Dick Inc. v. Principi*, 324 F.3d 1364, 1370 (Fed. Cir. 2003); *Melka Marine, Inc. v. United States*, 187 F.3d 1370, 1376 (Fed. Cir. 1999). We address whether KBJ is entitled to unabsorbed overhead for the alleged NASA-caused delays.

I. Suspension of Boiler Demolition

The project's critical path began with the demolition of Boilers 3 and 4 (finding 45). Under KBJ's original approved schedule, it planned to complete demolition of those boilers prior to the delivery of the replacement boilers (finding 8). On 26 May 2011, less than two weeks after NASA approved KBJ's schedule, it instructed KBJ not to demolish the boilers until the replacement boilers were in the Cleveland area. The directive

19

suspended the boiler work for an indefinite period. (Finding 9)  NASA did not allow KBJ to begin demolition of Boiler 3 until 1 March 2012 (finding 17).  This extended the contract's performance period past the original 4 November 2011 project completion date. NASA's directive delayed contract performance substantially, by 280 days (finding 50), 100 days longer than the 180-day period in which KBJ was initially required to complete the contract work (finding 7).

NASA concedes that its directive was an exercise of its authority under the Suspension of Work clause (gov't br. at 22; gov't reply br. at 3), but it argues that it did not suspend all work and KBJ's failure to perform other available work in 2011 (finding 14) concurrently delayed the project.  We found KBJ responsible for the delay in completing the non-boiler work it had identified as possible to perform in 2011, but that this work was not on the critical path (finding 51).  Because the non-boiler work was not on the critical path, KBJ's delay in performing that work did not concurrently delay the prosecution of the project as a whole.

Accordingly, KBJ has met the first two prerequisites for recovery under *Eichleay*: there was a government-caused delay of uncertain duration, not concurrent with a relevant contractor-caused delay, that extended the contract's performance time.  Because there was no written suspension order by the CO, KBJ must establish the third prerequisite, standby, through indirect evidence.

Regarding the first standby factor, as we have stated, NASA's suspension directive delayed contract performance substantially, for an indefinite period.  However, on 12 September 2011 NASA provided a date certain for the resumption of boiler work (finding 17), such that the delay was only indefinite for the 109 days preceding NASA's notice (finding 50).  After the notice, KBJ could not be on standby because the delay then was for a definite duration.  *P.J. Dick*, 324 F.3d at 1371 ("where the government suspends all work on the contract, but tells the contractor work will begin again on a date certain, the contractor cannot be on standby").

As to the second standby element, NASA's suspension directive anticipated that KBJ would remain on site, performing other tasks, until the boilers arrived (finding 9). NASA acknowledges that "NASA's Project Manager expressly directed Appellant to proceed with all other work that could be performed" (gov't reply br. at 34).  Thus, in effect, KBJ had to keep workers on site during the delay and be ready to resume boiler work immediately.  As we found, the delay originating with NASA's 26 May 2011 directive delayed the project's critical path work by 109 days (finding 50).

Regarding the third standby element, NASA alleges that KBJ was not on standby because it could perform other work, referring to the work identified by KBJ on 20 June 2011 (finding 14), which we found could have been performed during the delay in boiler work (finding 51).  However, a contractor's work force need not be completely idle to be

20

on standby. *Altmayer*, 79 F.3d at 1134; *see also P.J. Dick*, 324 F.3d at 1371. A contractor can be on standby when it was only able to continue performance of insubstantial work on the contract. *Id.* at 1372-73. We found that the non-boiler work KBJ could have performed was insubstantial in comparison to the contract as a whole (finding 51). The contract was for the replacement of Boilers 3 and 4 (finding 1), and that work could not commence during the suspension of boiler demolition. KBJ has thus met the third standby element.

The burden therefore shifts to NASA "to show that it was not impractical for the contractor to take on replacement work." *P.J. Dick*, 324 F.3d at 1370. NASA points to three projects, two of which KBJ was awarded and one on which KBJ bid unsuccessfully (*see* finding 53). It is insufficient merely to show that a contractor could take on some other work during the delay period. *See Melka*, 187 F.3d at 1377 (court improperly focused upon contractor's "ability to take on *any* other work during the delay period"). The critical factor is not whether a contractor can obtain additional work, but rather a contractor's "ability to obtain a *replacement* contract to absorb the indirect costs that would otherwise be unabsorbed solely as a result of a government suspension on one contract." *All State Boiler*, 146 F.3d at 1377. We conclude that the projects NASA identified do not amount to replacement work. The two projects awarded to KBJ were for $86,125 and $171,574, far less that the $3.6 million value of the subject steam plant contract as awarded. Even including KBJ's $525,805.52 bid for the project it was not awarded, the three projects' value totaled $783,504.52, less than half the value of the steam plant contract. (Finding 53)

NASA has not met its burden. Accordingly, we find KBJ entitled to recover for 109 days of unabsorbed overhead under *Eichleay*.

## II. Additional Asbestos

We found that issues surrounding the additional asbestos encountered in the boilers delayed the project for 127 days (finding 52). However, we must first address NASA's dispositive contention that KBJ's claim, with regard to those delays, is barred by the doctrine of accord and satisfaction.

Modification Nos. 5 and 6, which added the additional asbestos work to the contract, each concluded with the same acknowledgment that "claims for equitable adjustment of the contract price and time pursuant to the [Changes clause] and Mutual Agreement are hereby fully satisfied and discharged with respect to this Supplemental Agreement" (findings 33, 40). NASA urges that this language unambiguously discharged any KBJ claim for asbestos delay costs. KBJ has not alleged that there was any additional asbestos work beyond that covered by Mod. No. 5 and Mod. No. 6 (finding 40).

21

As we have stated:

> Release and accord and satisfaction are separate affirmative defenses. "A release is a contract whereby a party abandons a claim or relinquishes a right that could be asserted against another." An accord and satisfaction occurs when "a claim is discharged because some performance other than that which was claimed to be due is accepted as full satisfaction of the claim." Although the defenses are distinct, "an agreement may constitute both a release and an accord and satisfaction, either of which may bar future claims."

*Optex Systems, Inc.*, ASBCA No. 58220, 14-1 BCA ¶ 35,801 at 175,097 (citations omitted).

In this case, we conclude that the term "release" is the more apt. A release "is interpreted in the same manner as any other contract term or provision," *Bell BCI Co. v. United States*, 570 F.3d 1337, 1341 (Fed. Cir. 2009), which is to say that it is interpreted as a whole, to harmonize and give a reasonable meaning to all of its parts. *See NVT Technologies, Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004). If a release's terms are clear and unambiguous, we are to give them their plain and ordinary meaning, without resort to extrinsic evidence. *Bell BCI*, 570 F.3d at 1341. If a "release is ambiguous as to its scope of coverage, we construe its language to effect the parties' intent at the time they executed the release." *Dureiko v. United States*, 209 F.3d 1345, 1356 (Fed. Cir. 2000); *see also Optex Systems*, 14-1 BCA ¶ 35,801 at 175,097 ("[I]f the words defining the scope of the release are ambiguous in their application to a contractor's claim, courts and boards will ascertain the parties' intent by examining the parties' conduct leading up to the modification.").

Here, Mod. Nos. 5 and 6 each added additional asbestos abatement to the contract work. Prior to its execution of Mod. No. 5, apparently in connection with asbestos abatement, KBJ had expressed a concern to NASA about "start/stop" impacting the job and slowing progress (finding 32), but if it was not satisfied that Mod. No. 5 had compensated it adequately for delays, it did not add any exception to the modification's release language. Both Mod. Nos. 5 and 6 clearly provide, without exception, that the parties "acknowledge and agree that any and all claims for equitable adjustment of the contract price and time pursuant to the [Changes clause] and Mutual Agreement are hereby fully satisfied and discharged with respect to this Supplemental Agreement." (Findings 33, 40) If KBJ had intended to except asbestos-related delays and to contest the modifications' 31 December 2012 contract completion date, as indicated in its 19 September 2012 letter to the CO (finding 41), it did not do so.

Accordingly, KBJ's claim for compensation and time due to delays occasioned by additional asbestos encountered in the boilers is barred by release.

## Quantum

KBJ is entitled to recover 109 days of unabsorbed overhead costs resulting from NASA's 26 May 2011 directive suspending demolition of Boilers 3 and 4. We have accepted KBJ's unchallenged calculation of a $1,047.63 daily overhead rate under the first two steps of the *Eichleay* formula (finding 55). Multiplying that rate by the 109 days of entitlement, the third step of the *Eichleay* formula, we find KBJ entitled to an equitable adjustment of $114,191.67

## DECISION

The appeal is sustained in part and denied in part. We award KBJ $114,191.67 plus interest pursuant to the CDA, 41 U.S.C. § 7109, running from 8 October 2012, the date we infer the CO received KBJ's claim (finding 42), until paid.

Dated: 3 March 2016

CHERYL L. SCOTT
Administrative Judge
Armed Services Board
of Contract Appeals

I concur                                        I concur

MARK N. STEMPLER                     RICHARD SHACKLEFORD
Administrative Judge                     Administrative Judge
Acting Chairman                          Vice Chairman
Armed Services Board                    Armed Services Board
of Contract Appeals                      of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 58512, Appeal of KBJ, Inc., rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals

24